**UNITED STATES of America, Appellee,**

v.

**Larry D. BURCH, Appellant.**

**Nos. 97–3032, 97–3157.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 3, 1998.

Decided Oct. 9, 1998.

Gary E. Guy, appointed by the Court, argued the cause and filed the briefs for appellant.

David B. Goodhand, Assistant United States Attorney, argued the cause for appellee, with whom Wilma A. Lewis, United States Attorney, John R. Fisher, Thomas J. Tourish, Jr., M. Evan Corcoran and Carolyn K. Kolben, Assistant United States Attorneys, were on the brief. Ann L. Rosenfield, Assistant United States Attorney, entered an appearance.

Before: WALD, WILLIAMS and TATEL, Circuit Judges.

WALD, Circuit Judge:

On December 6, 1995, a jury convicted Larry Burch ("Burch") of possession with intent to distribute more than 50 grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii) (1994), while acquitting him on a charge of conspiracy to distribute and to possess with intent to distribute cocaine base in violation of 21 U.S.C. § 846 (1994). While the defendant's direct appeal was pending, he petitioned for a writ of habeas corpus under 28 U.S.C. § 2255 (1996), alleging both ineffective assistance of counsel and prosecutorial misconduct. The district court judge who presided over the defendant's trial denied the petition on November 7, 1997. An order of this court, dated January 27, 1998, consolidated the defendant's direct appeal with his subsequent petition for a certificate of appealability under 28 U.S.C. § 2253 (1996), necessary to appeal the denial of his § 2255 motion.

In this consolidated appeal, the defendant challenges his conviction on the basis of alleged errors made by the district court in (1) holding that the defendant had made a knowing and voluntary waiver of his rights under Rule 11(e)(6) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, such that statements made during his plea hearing and subsequent debriefing could be offered into evidence by the prosecution; (2) allowing evidence of the defendant's prior conviction for attempted cocaine distribution into evidence under Rule

404(b) of the Federal Rules of Evidence; and (3) denying a motion to suppress the fruits of an August 11, 1995 search by officers of the Metropolitan Police Department on the grounds that its execution at 11:00 p.m. violated federal law. He further asserts that his trial counsel was constitutionally ineffective for failing to seek a judicial hearing to enforce the terms of a plea agreement signed by appellant and the United States Attorney's Office, and for failing to complete the impeachment of a government witness. Finally, he alleges that the prosecutor knowingly sponsored false or misleading testimony by the same government witness, and that this instance of prosecutorial misconduct materially affected the outcome of his trial.[1] Finding no merit in any of these claims, we affirm the conviction and deny the request for a certificate of appealability.

## I. BACKGROUND

In August of 1995, a confidential informant notified the Metropolitan Police Department ("MPD") that crack cocaine was being sold out of a residence at 446 N Street in northwest Washington, D.C. In order to verify the allegation, the MPD arranged for this "special employee" to make a controlled purchase of narcotics from that location.[2] When the purchased substance tested positive for cocaine base, MPD Sergeant Gerald G. Neill procured a warrant that authorized a search of the premises "in the daytime/at any time of the day or night." Before executing the warrant at approximately 11:00 p.m., Sergeant Neill and his fellow officers set up and observed a second controlled purchase. After the special employee handed MPD funds over to a figure who then retreated into the house, the police officers announced their presence and proceeded to conduct their search.

Through the open front door, Sergeant Neill observed a woman descending the interior staircase, before halting her downward progress and sprinting back up the stairs. He followed the woman into an upstairs bedroom, where he found and, after a brief altercation, subdued both the woman—Oneida Bailey ("Bailey")—and the defendant. At that time, Sergeant Neill and the two other officers conducted their search of the premises, discovering: plastic bags containing rocks of crack cocaine packaged in an eighth of an ounce quantities commonly referred to as "eight balls," smaller rocks of crack cocaine wrapped in plastic bags, two ziploc bags containing cocaine powder, other plastic bags of various sizes, a razor blade, a scale, and eight hundred and thirty dollars, which included the MPD funds used by the special employee. In total, the MPD recovered 50.58 grams of cocaine base and 1.16 grams of cocaine powder. From the bedroom, the police also seized two photographs of the defendant, as well as several forms of identification containing his name and the 446 N Street address.

Following his arrest, Burch entered into plea negotiations with members of the United States ("U.S.") Attorney's Office, culminating in an October 25, 1995 agreement in which he pled guilty to possession with intent to distribute more than 50 grams of crack cocaine, count two of his four-count indictment. Burch also agreed to assist law enforcement authorities whenever and in whatever form the U.S. Attorney's Office deemed appropriate. In return, the government agreed to request the dismissal of the other three counts of the indictment, to allow the defendant's presentence release into the community to assist in undercover operations, and to inform the U.S. Attorney's Departure Guideline Committee of the nature and extent of the defendant's cooperation. Should the Departure Committee determine that the defendant had rendered substantial assistance to the investigation and prosecution of another individual, it would file a

---

1. Appellant makes a number of further claims, none of which warrant discussion.

2. In the typical controlled buy, police officers will give a special employee money with which to make a narcotics purchase. After first searching that individual to ensure that he has neither money nor drugs on his person, the officers will give him police department dollars and then observe the consummation of the intended transaction. Upon the special employee's return, the officers conduct a second search so as to verify that the police money has been exchanged for narcotics.

motion pursuant to 18 U.S.C. § 3553(e) (1994) in order to allow the sentencing judge to depart downwards from the federal sentencing guidelines.

Burch, however, did not prove particularly cooperative, despite being informed by the trial judge on several occasions that he faced a mandatory minimum sentence of twenty years if he did not provide some opening for a downward departure by assisting the government. He did outline the history of his involvement in narcotics distribution in a debriefing session with the Drug Enforcement Agency ("DEA"), discussing the identity of his sources as well as the quantities of crack cocaine that he typically purchased from them, but not much more. The defendant's name came up in relation to a homicide in May and June of 1996 and, at the government's request, the court revoked his bond and detained him pending sentencing. When questioned about the homicide, Burch was not forthcoming, and told a story which he subsequently recanted. On July 22, 1996, the Assistant U.S. Attorney supervising the case filed a memorandum with the Departure Committee outlining the limited nature of Burch's cooperation. Eight days later, the defendant's trial counsel filed a motion seeking to withdraw the guilty plea and alleging Burch's innocence of the underlying narcotics offense. In the motion, as well as in an August 1, 1996 letter addressed to the trial judge, Burch disavowed any knowledge of the drugs prior to their discovery by the MPD, and asserted that the cocaine belonged to Bailey. He explained his guilty plea as a product of threats by Bailey to implicate him as a part of her own cooperation agreement with the government, coupled with a belief that a jury would be more likely to credit her testimony over his denial, given his status as a young black male with a prior arrest for possession with intent to distribute crack cocaine.[3]

After a hearing, the trial court judge ultimately allowed Burch to withdraw his plea pursuant to Rule 32(e) of the Federal Rules of Criminal Procedure. "Implausible as Mr.

Burch's belated claim of innocence may seem, the Court will give Mr. Burch his day in court." Memorandum Opinion and Order, *United States v. Burch*, Crim. No. 95–225–01, at 5–6 (D.D.C. Oct. 8, 1996) ("Mem. Op."). However, as part of its decision, the court stated that it would not allow him to benefit from Federal Rules of Criminal Procedure Rule 11(e)(6) and Federal Rules of Evidence Rule 410's restriction on the admissibility of statements made pursuant to a withdrawn plea. *Id.* at 6. In his plea agreement, as well as in a Rule 11 colloquy with the trial judge prior to entering the plea, Burch specifically had waived his rights under Rules 11(e)(6) and 410. In allowing him to withdraw the plea, the trial court announced its intention to hold the defendant to this part of the agreement. *See id.* at 6–7. The court ultimately ruled that statements made by appellant during the October 25, 1995 plea hearing and a January 22, 1996 debriefing with the DEA could be used as part of the prosecution's case-in-chief, while those made during plea negotiations taking place on October 24, 1995 could only be used for rebuttal or impeachment purposes should the defendant contradict them while on the witness stand.

After a three-day trial, a jury convicted the defendant of possession with intent to distribute more than 50 grams of crack cocaine, while acquitting him of conspiracy to do the same. The trial judge subsequently imposed a sentence of one hundred fifty one months imprisonment, to be followed by five years of supervised release.

## II. DISCUSSION

### A. *Appellant's Evidentiary Challenges*

#### 1. *The Withdrawn Plea*

##### a. *Waiver*

■ Federal Rule of Criminal Procedure 11(e)(6) and Federal Rule of Evidence 410 each restrict the admissibility in a trial of a guilty plea previously withdrawn, as well as any statements made during the discussions

---

**3.** Appellant was arrested on June 5, 1994, on the same block as the 446 N Street residence, for possessing 18 ziploc bags containing crack co- caine. He later pled guilty to attempted posses- sion with intent to distribute crack cocaine.

leading up to such a plea. Appellant challenges the legality of his waiver of these rights as a part of his guilty plea, asserting that he entered into the plea agreement involuntarily.[4] Appellant contends that Bailey threatened to testify against him, and that he feared a trial wherein her false testimony could lead to his conviction on all four counts of his indictment. To avoid this jeopardy, he claims, he accepted the U.S. Attorney's offer to plead guilty to a single offense. Before reaching the question of the voluntariness of the plea, however, we must first determine whether and for what purposes an individual can waive the protections contained in Rules 11(e)(6) and 410.

▪ The Supreme Court provided a partial answer in *United States v. Mezzanatto,* 513 U.S. 196, 201, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995), where it held that the "provisions of those Rules are presumptively waivable...." Since "[a] criminal defendant may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution," *id.,* the Court reasoned that evidentiary rules should be subject to a similar presumption. While evidence of fraud or coercion can invalidate waiver agreements, "absent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement Rules is valid and enforceable." *Id.* at 210, 115 S.Ct. 797.

As expansive as this language sounds, the Supreme Court faced a narrower question in *Mezzanatto* than that which we confront to-

day. There, the prosecutor had required, as a precondition to conducting plea negotiations, that the accused agree to allow the use of any statements made over the course of their discussions to impeach any contradictory testimony given in the case of a trial. When the negotiations faltered, the government prosecuted Mr. Mezzanatto for possession with intent to distribute methamphetamine, and he took the stand as part of his defense. On direct examination, Mezzanatto denied having knowledge that the package he sold to an undercover officer contained methamphetamine. On cross-examination, and later with rebuttal witnesses, the prosecutor impeached this testimony with Mezzanatto's statements made during the plea negotiations. *See id.,* at 198–99, 115 S.Ct. 797. On appeal, then, the Supreme Court only had to decide whether the protections contained in Rules 11(e)(6) and 410 could be waived for purposes of impeachment or rebuttal. In the case at bar, by contrast, the district court allowed the defendant's plea statement, as well as the conversations he had during the January 22nd debriefing session with the DEA, into evidence as a part of the prosecution's case-in-chief. *See* 12/4/96 Trial Tr. at 29–30.

Although we face here the additional question of whether a defendant's Rule 11(e)(6) rights can be waived for purposes of the prosecution's case-in-chief, our inquiry still begins with *Mezzanatto*. Justice Thomas' opinion paints with broad brush strokes, and its reasoning resonates beyond the precise question upon which it ruled. In a one paragraph concurring opinion, Justice Ginsburg,

---

**4.** Rules 11(e)(6) and 410 restrict the admissibility of "any statement made in the course of plea discussions ...," which appellant interprets to encompass the October 24th plea negotiations, the October 25th plea agreement, and the January 22nd DEA debriefing. Because the trial judge only admitted the plea agreement and the debriefing statements into evidence as part of the prosecution's case-in-chief, the discussion of extending *United States v. Mezzanatto,* 513 U.S. 196, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995), contained in this subsection only refers to those two items, and not to the plea negotiations. Moreover, the Eighth, Tenth, and Eleventh Circuits have each held that statements made after a plea agreement is reached are not entitled to the Rules' protections, *see United States v. Watkins,* 85 F.3d 498, 500 (10th Cir.), *cert. denied,* ——

U.S. ——, 117 S.Ct. 269, 136 L.Ed.2d 193 (1996); *United States v. Lloyd,* 43 F.3d 1183, 1186 (8th Cir.1994); *United States v. Knight,* 867 F.2d 1285, 1288 (11th Cir.1989), reasoning that "[o]nce a plea contract is formed, the policy behind Rule 11(e)(6)—to allow a defendant to freely negotiate without fear that statements will be used against him—is no longer applicable." *Id.* Interpreting an earlier version of Rule 11(e)(6), before a 1979 amendment established its current form, this court drew a similar distinction. *See United States v. Davis,* 617 F.2d 677, 685 (D.C.Cir.1979). Here, since we conclude that appellant waived the protections extended by Rules 11(e)(6) and 410, we need not determine whether they would cover the January 22nd debriefing session, which occurred after the plea agreement had been reached.

joined by Justices O'Connor and Breyer, cautioned that the *Mezzanatto* decision did not address the question of whether a waiver of Rule 11(e)(6) for purposes of the prosecution's case-in-chief would be valid. The concurrence raised the question of whether "a waiver to use such statements in the case-in-chief would more severely undermine a defendant's incentive to negotiate," 513 U.S. at 211, 115 S.Ct. 797 (Ginsburg, J., concurring), than the waiver for impeachment purposes sanctioned by the Court's decision, thereby presenting a more pressing public policy justification for disallowing a presumption of waivability.

On reflection, however, we cannot discern any acceptable rationale for not extending the majority opinion in *Mezzanatto* to this case. Justice Thomas' opinion rests on three principles. First, it finds that in the absence of an affirmative indication that Congress intended to preclude or to limit the waiver of statutory protections, including evidentiary rules, voluntary agreements to waive these protections are presumptively enforceable. *See Mezzanatto*, 513 U.S. at 201–02, 115 S.Ct. 797. Second, the opinion rejects the argument that Rules 11(e)(6) and 410, as well as the Advisory Committee's Notes which accompany them, express congressional disfavor towards waivability. *See id.* at 208 n. 5, 115 S.Ct. 797. Finally, the opinion stresses that in weighing whether to override a presumption of waivability, a court should assess the public policy justifications, if any, which counsel in favor of departing from that norm. *See id.* at 204–10, 115 S.Ct. 797. Cumulatively, we believe these principles do not countenance drawing any distinction in this case between permitting waivers for purposes of impeachment or rebuttal and permitting waivers for the prosecution's case-in-chief.

There are two arguments in favor of restricting the reach of *Mezzanatto* to rebuttal and impeachment. They go like this: First, in enacting Rules 11(e)(6) and 410, Congress has signaled an intent to create rights that benefit both the accused and the federal judicial system. Although most personal rights are presumptively waivable, when rights serve as a surrogate for protecting institu-

tional interests, the economic model of bargaining, *see United States v. Wenger*, 58 F.3d 280, 282 (7th Cir.1995) ("Right holders are better off if they can choose between exercising the right and exchanging that right for something they value more highly.") does not suffice. The Advisory Committee's Notes reference both individual and systemic concerns, describing the purposes behind the two rules as not to "discourage defendants from being completely candid and open during plea negotiations," and "to permit the unrestrained candor which produces effective plea discussions." FED.R.CRIM.P. 11 Advisory Committee's Note (1979) (internal citations omitted). If extending *Mezzanatto* would undermine Congress' attempt to promote candid plea discussions, deference to congressional intent could counter the presumption of waivability. We think that there is a ready answer to this argument: the *Mezzanatto* Court declined to read the Notes as mandating any default rule against waiver, a position that Justice Souter staked out in dissent. *See* 513 U.S. at 214, 115 S.Ct. 797 (Souter, J., dissenting) ("Since the zone of unrestrained candor is diminished whenever a defendant has to stop to think about the amount of trouble his openness may cause him if the plea negotiations fall through, Congress must have understood that the judicial system's interest in candid plea discussions would be threatened by recognizing waivers under Rules 410 and 11(e)(6)."). According to the Court, "[t]he Advisory Committee's Notes *always* provide some policy justification for the exclusionary provisions in the Rules, yet those policies merely justify the default rule of exclusion; they do not mean that the parties can never waive the default rule." *Id.* at 208 n. 5, 115 S.Ct. 797. Since the Supreme Court has already rejected congressional intent to promote candor as a justification for refusing to enforce voluntary waivers of these Rules in rebuttal, any argument relying on that intent is too weak to justify refusing to allow use of the plea statement in the government's case-in-chief. In any event, the waiver in this case was part of the plea agreement; it resulted from successful plea negotiations. During the negotiations, the defendant was protected by Rules 11(e)(6) and 410. Thus, it is difficult to see

how the waiver in this case could have reduced the "zone of unrestrained candor" during negotiations, as the waiver in *Mezzanatto*, which was secured by the prosecutor at the start of bargaining, arguably did.

Second, while it is conceivable that sanctioning waivers for the use of statements made during plea proceedings in the prosecution's case-in-chief, as opposed to impeachment or rebuttal, could have a markedly greater impact on the willingness of defendants to participate in such negotiations, the three-Justice concurrence in *Mezzanatto* presents no reason why that would be the case. Nor has the appellant. Lacking any evidence to the contrary, it seems unlikely to us that most defendants would draw fine distinctions as to whether statements made in the course of or after the plea proceeding could be used in the government's case-in-chief or only in rebuttal. It is true that the three concurring Justices in *Mezzanatto*, whose votes were necessary for the majority, expressed concern that admitting plea negotiation statements in the case-in-chief would too severely undermine the defendant's incentives to negotiate. *See id.* at 211, 115 S.Ct. 797. Such concern is far less warranted with respect to a waiver, like the one in this case, which is executed as a result of plea negotiations, rather than as a condition for such negotiations. In any event, allowing the government to bargain for a waiver during plea negotiations certainly does not undermine the reliability of the fact-finding process, the only institutional concern cited by *Mezzanatto* as a potential counterweight to the presumption in favor of waivability. *See id.* at 204, 115 S.Ct. 797 (some evidentiary provisions are so fundamental that permitting their waiver would discredit the integrity of the federal judicial process; "if the parties stipulated to trial by 12 orangutans the defendant's conviction would be invalid notwithstanding his consent") (citations omitted). As a result, we can discern no reason not to uphold the trial judge's ruling in this case that a defendant can waive his rights under Rules 11(e)(6) and 410 to the extent of allowing statements made in the plea proceeding itself and in a subsequent debriefing to be used as part of the prosecution's case-in-chief.

### b. *Knowing and Voluntary*

■ Having decided that a defendant can affirmatively waive his rights under Rules 11(e)(6) and 410 to allow his plea statement to be admitted into evidence, we move on to appellant's more basic contention that his waiver was involuntary. Before any waiver can be deemed unenforceable, *Mezzanatto* held that a trial judge must find "some affirmative indication that the agreement was entered into unknowingly or involuntarily." *Id.* at 210, 115 S.Ct. 797. For this indication, appellant relies on the district court's decision to permit him to withdraw his plea, alleging that it represents an implicit finding of involuntariness.[5] The district court, however, gave no such indication. It characterized appellant's belated assertion of innocence as both "implausible" and "hard to accept," Mem. Op. at 5, and decided to grant him the opportunity to present his case before a jury primarily because a trial represented appellant's "only chance to avoid the draconian sentence adopted by Congress for possession of crack cocaine by one previously convicted of a drug offense." *Id.* at 6. Moreover, it specifically warned him that it would allow all of appellant's plea statements into evidence for impeachment, rebuttal, or the case-in-chief in any future trial, an act that belies any view that the plea or the waiver were coerced.

■ "This court reviews a trial judge's admission of evidence for abuse of discretion," *United States v. Smart*, 98 F.3d 1379,

---

5. Appellant's specific contention that he involuntarily waived the protections of Rules 11(e)(6) and 410 derives from his broader claim that he did not enter into the plea agreement voluntarily. He makes no attempt to deconstruct the plea agreement into individual components, nor to claim that he acceded to a particular provision involuntarily, independent of his intention with respect to the entire plea. Therefore, we can only review whether his waiver was knowing and voluntary through examining, as the trial court did, the nature of the plea agreement that subsumes it. By contrast, the waiver addressed in *Mezzanatto* had been negotiated separately, before the plea discussions began. Therefore, the *Mezzanatto* Court could focus specifically on the voluntary nature of the waiver of the nonadmissibility guarantees.

1386 (D.C.Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1271, 137 L.Ed.2d 349 (1997) (citing *United States v. Salamanca,* 990 F.2d 629, 637 (D.C.Cir.), *cert. denied,* 510 U.S. 928, 114 S.Ct. 337, 126 L.Ed.2d 281 (1993)); that standard is easily satisfied here. Neither the Rule 11 plea colloquy between the trial judge and appellant, nor the judge's order permitting appellant to withdraw the plea, support in any way appellant's contention that the plea itself was entered into involuntarily. The trial court asked the appellant "has anybody threatened you or forced you in any way to enter this plea of guilty?" 10/25/95 Tr. at 17. "And are you pleading guilty voluntarily and because you are guilty?" *Id.* at 19. Appellant answered both questions in the affirmative. The trial judge also went through the specific terms of the plea agreement with appellant, including the provision in which he waived his rights under Rules 11(e)(6) and 410. When subsequently challenged, the judge characterized appellant's waiver of his rights under Rules 11(e)(6) and 410 as "knowing and voluntary," Mem. Op. at 7, and rejected the defendant's motion to suppress on the grounds that "[t]here was nothing wrong with the plea proceeding. There was nothing wrong with [appellant's] understanding of what was going on. He made the statements. He made those statements under oath." 12/3/96 Trial Tr. at 75. The extensive colloquy conducted by the trial court clearly supports this determination that appellant knowingly and voluntarily waived his rights under Rules 11(e)(6) and 410. In no way could such a decision to permit the plea statement and the debriefings into evidence constitute an abuse of discretion.

Our ruling is in accord with our own precedent. In *United States v. Cray,* 47 F.3d 1203 (D.C.Cir.1995), the defendant sought to withdraw his plea as the product of coercion due to a co-defendant's alleged threats to testify against him in return for a lesser sentence. *See id.* at 1205. We refused to characterize the plea as involuntary, explaining that before accepting his guilty plea, the trial court judge had conducted a "textbook Rule 11 inquiry, taking pains to insure that the defendant's submissions were knowing and voluntary." *Id.* at 1208. Since the trial judge's voluntariness determination ultimately rested upon a credibility finding, this court refused to disturb it absent clear evidence to the contrary. *Id.* at 1209 (citing the clearly erroneous standard utilized in *United States v. Lloyd,* 868 F.2d 447, 451 (D.C.Cir.1989)). *See also United States v. Hernandez,* 79 F.3d 1193, 1195 (D.C.Cir.1996) (where the trial court conducted an extensive Rule 11 colloquy and a hearing on the defendant's plea withdrawal motion, there is no reason to cast doubt on the court's conclusion that the plea was voluntary); *United States v. Woolley,* 123 F.3d 627, 632–34 (7th Cir.1997) (extensive and careful Rule 11 colloquy conducted prior to accepting defendant's guilty plea fully supports determination that defendant accepted plea knowingly and voluntarily); *United States v. Clements,* 992 F.2d 417, 418–19 (2d Cir.1993) (extensive Rule 11 allocution fully established the voluntariness of defendant's plea).

### 2. *Prior Bad Acts*

■ Appellant also challenges the district court's denial of his motion *in limine* to exclude evidence of his prior arrest and conviction for attempted possession with intent to distribute crack cocaine, arguing that this "other crimes" evidence was both irrelevant to the charges against him and more prejudicial than probative. In addressing trial court determinations on the admissibility of bad acts evidence under the Federal Rules of Evidence, this circuit has employed a two-step mode of analysis. Under the first step, which addresses Rule 404(b), "we must determine whether the evidence is relevant to a material issue other than character." *United States v. Mitchell,* 49 F.3d 769, 775 (D.C.Cir. 1995) (citations omitted). *See also Huddleston v. United States,* 485 U.S. 681, 686, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988) ("The threshold inquiry a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character."). "If so, we proceed to the second inquiry," under Federal Rule of Evidence 403, "whether the probative value is substantially outweighed by the prejudice." *Mitchell,* 49 F.3d at 775.

■ Here, appellant was tried for possession with intent to distribute more than 50 grams of crack cocaine and conspiracy to possess and distribute the same. To establish the requisite elements on the possession count, the government needed to prove that appellant possessed crack cocaine knowingly and intentionally, and that when he possessed the cocaine he had a specific intent to distribute it. *See* 21 U.S.C. § 841(a)(1). In making the Rule 404(b) determination, the trial judge concluded that "[t]he fact is that the evidence [of appellant's prior conviction] is relevant to show knowledge and intent which are elements that the Government must prove.... It's within the very same block and it involved again crack cocaine. And his knowledge and intent with respect to crack cocaine is what is at issue here." 12/3/96 Trial Tr. at 42. Since the evidence of appellant's prior conviction went beyond the issue of character, and went to the issues of knowledge and intent which formed the basis of appellant's trial defense, the prior conviction satisfies the first step of the *Mitchell* analysis. *See United States v. Harrison,* 679 F.2d 942, 948 (D.C.Cir.1982) ("The intent with which a person commits an act on a given occasion can many times be best proven by testimony or evidence of his acts over a period of time prior thereto...."); *United States v. Crowder,* 141 F.3d 1202, 1208 n. 5 (D.C.Cir.1998) (in banc) ("A defendant's hands-on experience in the drug trade cannot alone prove that he possessed drugs on any given occasion. But it can show that he knew how to get drugs, what they looked like, where to sell them, and so forth.").

■ The second step of the analysis takes place under Rule 403, and involves balancing the probative value of other crimes evidence against its prejudicial effect upon the defendant. *See* FED.R.EVID. 403. Because this balancing involves a highly subjective assessment, this court conducts its review under a "grave abuse of discretion" standard. *See Mitchell,* 49 F.3d at 776. Here, the trial judge was clearly aware of the potential danger for "jury misuse of the evidence," *United States v. Brown,* 490 F.2d 758, 764 (D.C.Cir.1973), and crafted a careful limiting instruction to guide the jury away from drawing a conclusion on the basis of character or pro-

pensity. Given the likeness of the allegations, the similar mode of packaging the crack cocaine for distribution, the coincidence of the locations involved, and the corroboration provided by appellant in his debriefing session with the DEA, there is "no compelling or unique evidence of prejudice in this case that warrants upsetting the trial court's determination." *United States v. Washington,* 969 F.2d 1073, 1081 (D.C.Cir.1992).

### B. *The Validity of the Warrant as Executed*

Appellant also challenges the trial court's decision to permit the fruits of the MPD search into evidence, attacking the legal validity of both the underlying warrant and its nighttime execution. While appellant contends that the validity of the warrant's execution must be measured against federal standards because "a federal offense has been charged and the trial was held in federal court," Appellant's Br. at 28, we need not decide whether the warrant is federal or local, nor need we choose between the federal and the local law standard to measure the legality of its execution. The warrant and its nighttime execution were valid under either regime.

■ Beginning with federal law, Rule 41 of the Federal Rules of Criminal Procedure directs that a "warrant shall be served in the daytime, unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime." FED. R.CRIM.P. 41(c)(1). *See also* FED.R.CRIM.P. 41(h) (defining "daytime" as "the hours from 6:00 a.m. to 10:00 p.m. according to local time"). Nevertheless, in the face of a specific statutory regime for an articulated class of offenses, the general provisions contained in Rule 41 are displaced. *See United States v. Berry,* 113 F.3d 121, 123 (8th Cir.1997) (holding that § 879 governs search for marijuana, rather than Rule 41); *Mason v. United States,* 719 F.2d 1485, 1489 (10th Cir.1983) (interpreting Wyoming parallels to Rule 41 and § 879 such that the specific statutory provisions sanctioning nighttime search for controlled substances apply); *United States*

*v. Alatishe,* 616 F.Supp. 1406, 1411 (D.D.C. 1985) ("Where there is a specific statute relating to the issuance and execution of search warrants, that particular statute as a general matter controls over any more diffuse search warrant legislation or policy."). This case provides an example.

■ 21 U.S.C. § 879 instructs that a "search warrant relating to offenses involving controlled substances may be served at any time of the day or night if the judge or United States magistrate issuing the warrant is satisfied that there is probable cause to believe that grounds exist for the warrant and for its service at such time." In *Gooding v. United States,* 416 U.S. 430, 94 S.Ct. 1780, 40 L.Ed.2d 250 (1974), the Supreme Court addressed the interaction between Federal Rule of Criminal Procedure 41 and then 21 U.S.C. § 879(a).[6] After noting that Rule 41 had been amended subsequent to the passage of § 879(a), the Court went on to hold that "Congress, as it had in the earlier version of the Rule, nevertheless showed its clear intention to leave intact other special search warrant provisions, including, of course, the provisions relating to searches for controlled substances." *Id.* at 453–54, 94 S.Ct. 1780.

The *Gooding* Court confronted a fact pattern analogous to the present case. There, an Assistant United States Attorney had sought a warrant authorizing a search for narcotics, and in support of his application presented an affidavit signed by an undercover MPD officer alleging knowledge of the possession and sale of drugs. The defendant challenged the validity of the warrant for a search "at any time in the day or night," 416

U.S. at 442, 94 S.Ct. 1780, alleging that the magistrate failed to make a special showing of need for its nighttime execution. In the present case, appellant similarly reads the final clause of § 879—requiring "that there is probable cause to believe that grounds exist for the warrant and for its service at such time"—as creating an obligation on the part of the government to establish probable cause for a nighttime search. While this certainly constitutes a plausible reading of the statutory language, the Supreme Court has explicitly rejected it. Speaking directly to the issue, the Court concluded "that 21 U.S.C. § 879(a) requires no special showing for a nighttime search, other than a showing that the contraband is likely to be on the property or person to be searched at that time." *Id.* at 458, 94 S.Ct. 1780.[7] Just as the prior controlled buy provided the requisite "showing" in *Gooding,* so too does the previous purchase of crack from the 446 N Street residence legitimate the MPD's subsequent nighttime search under federal law.

■ Under District of Columbia law, the analysis comes out the same. The District of Columbia Code parallels federal law, in that it contains a background warrant provision in Title 23 § 521,[8] as well as a particular provision directed at controlled substances in Title 33 § 565.[9] In *United States v. Thomas,* 294 A.2d 164, 167–68 (D.C.1972), *cert. denied,* 409 U.S. 992, 93 S.Ct. 341, 34 L.Ed.2d 258 (1972), the District of Columbia Court of Appeals determined that the specific provisions contained in Title 33 of the D.C.Code are neither superceded nor qualified by the more general provisions contained in Title 23. As both the warrant in question and its underlying affida-

---

**6.** A 1974 amendment to 21 U.S.C. § 879(a) struck out the designation (a); the statutory provision at issue in *Gooding* and in the present case are identical. *See* Pub.L. No. 93–481, § 3, 88 Stat. 1455 (1974).

**7.** In the present case, the district court judge assumed that in the absence of a finding of time-related probable cause, a nighttime search for narcotics could only be valid under District of Columbia law. While the district court judge believed that a search pursuant to 21 U.S.C. § 879 required that "an additional finding must be made by the Magistrate before authorizing a nighttime execution of a warrant," 12/3/96 Trial

Tr. at 66–67, *Gooding* specifically holds to the contrary.

**8.** "A search warrant shall contain ... a direction that the warrant be executed during the hours of daylight or, where the judicial officers have found cause therefor, including one of the grounds set forth in section 23–522(c)(1), and authorization for execution at any time of day or night." D.C.Code Ann. § 23–521(f)(5) (1997).

**9.** "The judge or Magistrate shall insert a direction in the warrant that it may be served at any time in the day or night." D.C.Code Ann. § 33–565(h) (1997).

vit each assert a belief that cocaine is being sold from the premises at 446 N Street, the more specific provisions contained in D.C.Code§ 33–565(h) would apply. Moreover, the District of Columbia Court of Appeals has also held that "once a judge has determined that probable cause exists to search for drugs in the District of Columbia, a search warrant may be issued. Such a warrant may be executed at any time of the day or night." *Hines v. United States,* 442 A.2d 146, 148 (D.C.1982).[10] According to the Court of Appeals, once a probable cause determination has been made, the issuing judge *must* insert the "any time during the day or night" directive. "The language [of D.C.Code § 33–565(h) ] is mandatory." *Id.* at 149.

■ As both federal and local law specifically provide for nighttime narcotics searches, appellant's argument stands or falls on its contention that the ambiguity resulting from Sergeant Neill's failure to cross out the warrant's "daytime" clause renders it invalid. Since neither of the potentially applicable standards contain a time restriction, we do not believe that this ministerial oversight in any way undermines the warrant's validity. Additionally, Sergeant Neill acted in good faith. His belief, as the district court found it, "that he could execute it at any time of the day or night since this was a drug warrant ...," 12/3/96 Trial Tr. at 60, satisfies the "objectively reasonable" test articulated in *United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

## C. *Appellant's Petition for a Certificate of Appealability*

Under 28 U.S.C. § 2253(c)(1)(B), an appeal cannot be taken from a final order in a § 2255 habeas corpus proceeding unless a circuit judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(2) provides that a certificate may issue "only if the applicant

has made a substantial showing of the denial of a constitutional right."

### 1. *Ineffective Assistance of Counsel*

■ In his § 2255 habeas corpus proceeding, appellant maintained that his trial counsel failed to satisfy the constitutionally prescribed minimum standard for effectiveness. He continues to press this claim in his petition for a certificate of appealability, challenging his counsel's failure: (i) to seek enforcement of the contractual plea agreement between appellant and the government, or at the very least to seek an evidentiary hearing through which appellant could establish that the government's refusal to file a 5K1.1 motion constituted a breach; and (ii) to complete the impeachment of Oneida Bailey with the notes from her debriefing session with the DEA. Because neither of these alleged inadequacies, whether considered individually or in aggregate, suffice to establish a claim for constitutional ineffectiveness under the standard articulated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), we decline to issue a certificate of appealability for appellant's Sixth Amendment claim.

In *Strickland,* the Supreme Court advised reviewing courts that they need not undertake both components of the ineffective assistance inquiry should it prove possible to dispose of a challenge on either of its prongs. *See id.* at 697, 104 S.Ct. 2052. Appellant's first assertion, that trial counsel should have sought to enforce the plea agreement, falters in its inability to make the requisite showing of prejudice—"that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A cursory comparison of the plea agreement's terms with the actions taken by the U.S. Attorney's Office reveals that the government fulfilled all of its responsibilities under it.[11] In particular, sections 9(d) and

---

10. In *Hines,* a warrant office clerk, acting without instructions, crossed out the 'at any time of the day or night' provision on the warrant form. The Court of Appeals held that this inadvertent ministerial mistake did not render the subsequent nighttime search invalid. *Id.* at 149.

11. The plain language of the plea signed by Burch makes it clear that he himself breached the agreement, first by failing to "cooperate truthfully, completely and forthrightly with [the U.S. Attorney's] Office and other Federal, state and local enforcement authorities whenever, wherever, and in whatever form this Office

(e) provide that the prosecutor "will inform the Departure Guideline Committee of the United States Attorney's Office for the District of Columbia the nature and extent of [appellant's] cooperation, or lack thereof," and that he will file a motion pursuant to 18 U.S.C. § 3443(e) and § 5K1.1 of the federal sentencing guidelines should the Departure Committee determine "that [appellant] had provided substantial assistance in the investigation or prosecution of another person who has committed any offense. . . ." Appellee's App. at 022–23. The Assistant U.S. Attorney involved in appellant's prosecution filed papers to apprise the Departure Committee of appellant's progress, and the Committee declined to authorize that any such motion be filed with the court. Because the government complied with the terms of the plea agreement, no effort by appellant's counsel could have obtained an order for specific performance.

Appellant next faults his trial counsel for failing to impeach Bailey with notes from a DEA debriefing session. At trial, appellant's defense centered around the argument that the drugs recovered by the MPD belonged to Bailey. In addition to so testifying, appellant developed this theory by arguing that he no longer resided at the 446 N Street residence in August of 1995, that the bedroom in which the cocaine was discovered belonged to Bailey, that she had made numerous drug sales earlier that day, and that she had recently purchased a quantity of cocaine similar to the amount recovered by the MPD. Notes from Bailey's DEA debriefing session provided some support for the last contention, in that they contained an entry, under the heading "Phil . . . Source of supply," that reads "62 grams—the most she's gotten from him." Appellant's App. at 151. When cross-examining Bailey, appellant's trial counsel repeatedly asked whether she had ever obtained 62 grams of crack cocaine from Phil.[12] Though she answered in the negative, defense counsel did not present her with a copy of the notes and ask her to explain any disparity between the text and her testimony.

Appellant alleges that this failure by defense counsel to produce the notes and to "complete the impeachment," Appellant's Br. at 36, of Bailey's testimony constitutes an oversight of constitutional magnitude. We cannot agree. Even if it constitutes a failure of advocacy,[13] appellant's claim cannot negotiate the hurdle of *Strickland*'s prejudice

---

deems appropriate,"—as required by section 3(a) of the plea—and later by filing a motion to withdraw his plea—an act which section 5(a) defines as a breach of the agreement. *See* Appellee's App. at 20–21.

**12.** The exchanges read:

Q: Didn't you once get 62 grams or something in that range from a guy named Phil?
A: Named Phil?
Q: Yes.
A: I didn't—I didn't get it from him but I know he had it.
Q: Did you ever get 62 grams from him or get something of that amount from Phil?
A: No, but he sells it but I never got it from him.
Q: But on other occasions you got drugs from Phil?
A: Yes.
12/5/96 Trial Tr. at 33.
Q: Did you ever—do you remember ever telling an investigator at a meeting that you got 62 grams once from Phil?
A: No.
Q: Didn't you once tell an investigator that you got 62 grams from Phil?

A: I never got that amount from him, never.
Q: Well, you never got an amount of that sort from Phil or from—
A: And I don't remember telling the investigator that.
Q: You don't remember telling the investigator that either.
A: No.
Q: So you didn't get 62 grams from Phil or from anyone, is that right?
A: No, I did not.
Q: And you don't remember telling any investigator that you got 62 grams from Phil.
A: No.
*Id.* at 70–71.

**13.** The trial court denied appellant's § 2255 petition on the grounds that defense counsel acted reasonably: "[W]ould a reasonable effective counsel have showed her the debriefing note? I'd say some would and some wouldn't." 11/7/97 Tr. at 50. Since we find any effect of defense counsel's alleged errors insufficient to justify overturning the jury's verdict, and "[f]ailure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim," *Strickland*, 466 U.S. at 700, 104 S.Ct. 2052, we need not pass judgment on the reasonableness of counsel's performance.

prong when examined in light of the record as a whole. *See Strickland,* 466 U.S. at 695–96, 104 S.Ct. 2052 (court looks to evidence in its totality when assessing potential prejudice). In addition to his earlier admission of guilt, the evidence marshaled against appellant was substantial. Most important, the DEA agent who conducted the January 22nd debriefing testified that appellant admitted to owning the crack cocaine seized by the MPD, and to having made his most recent buy just prior to his arrest. According to the DEA agent, appellant also described his source of cocaine base, the quantities he typically purchased and their cost, as well as his subsequent distribution. When Bailey testified that the cocaine belonged to appellant, she merely corroborated evidence already presented to the jury by numerous law enforcement officials.

Had defense counsel presented Bailey with the DEA debriefing notes and asked her to explain any disparity, that impeachment would not have cast any doubt on the testimony given by the various law enforcement witnesses. Since the notes lack any temporal references about the 62 grams, even if it could have been established that Bailey once received that quantity of cocaine from a supplier named Phil, no evidence links that receipt with the drugs appellant repeatedly admitted to owning.[14] As for its capacity to vitiate Bailey's credibility, we do not believe that the introduction of the DEA notes could have undermined her reliability significantly more than the testimony she had already given. Bailey admitted that she was intoxicated with a controlled substance on the night of the arrest, that she had participated in narcotics transactions which provided the basis for the search warrant and her arrest, that she had been convicted of possession with intent to distribute in the past, that she was cooperating with the government in return for a lighter sentence, and that she had broken the terms of her own plea agreement by continuing to use drugs and by being rearrested for heroin possession. Viewed in

light of the overwhelming evidence against appellant, including his previous admission not just of the fact but the details of his guilt, we cannot find that there is a reasonable probability that, had Bailey been confronted with the DEA notes, the jury verdict would have been any different. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

### 2. *Prosecutorial Misconduct*

■ Finally, appellant asserts that the prosecutor violated his Fifth Amendment right to due process of law by knowingly sponsoring, or by failing to correct, the allegedly false testimony of a government witness. Rehearsing the substance of his ineffective assistance claim, appellant highlights the discrepancy between Bailey's trial testimony and the DEA debriefing notes on the subject of whether she received drugs from Phil. He goes on to argue that, under *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the prosecution had a duty to alert the court to Bailey's prior inconsistent statement. *See also United States v. Iverson,* 637 F.2d 799, 803 n. 10 (D.C.Cir. 1980) ("[T]he prosecutor had an independent responsibility to alert the Court and jury to the truth."), *modified on petition for reh'g,* 648 F.2d 737 (D.C.Cir.1981). Rather than pointing out the disparity, appellant alleges that the prosecution exacerbated the deception by leading Ms. Bailey through the following rehabilitating exchange:

> Q: Did you ever tell a DEA agent you thought a guy named Phil might have 62 grams of crack?
>
> A: Yeah, when they asked.

12/5/96 Trial Tr. at 71. From this alleged failure by the prosecution to fulfill its affirmative obligation to correct the record when a government witness testifies falsely, appellant deduces a violation of due process. We disagree.

■ Even if appellant could establish that the prosecution either sponsored or

---

**14.** The only temporal reference consists of the statement "last contact—$150 purchase 8–ball in August." Appellant's App. at 151. Testifying at appellant's § 2255 hearing, the DEA agent who debriefed Bailey interpreted her notes to mean

that any receipt of 62 grams would have had to have taken place prior to August. However, as she had no specific recollection of her conversation with Bailey, she could offer only her best reconstruction of the notes.

failed to correct false testimony,[15] he cannot satisfy the materiality test for prosecutorial misconduct articulated in *Napue* and reiterated in *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) and *United States v. Agurs*, 427 U.S. 97, 112–13, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Before finding an error of constitutional significance, *Giglio* directs that a reviewing court must determine whether "the false testimony could in any reasonable likelihood have affected the judgment of the jury." *Id.* at 154, 92 S.Ct. 763 (citations omitted). Although the prosecutor and defense counsel have different obligations, in this instance we believe that our discussion of appellant's ineffective assistance of counsel claim effectively settles the issue. Just as we cannot find a reasonable probability that the jury verdict would have differed had defense counsel confronted Bailey with the notes, we cannot discern a reasonable likelihood of a different judgment even if appellant's interpretation of the notes had been expressed to the jury.

Appellant offers two theories as to how the prosecutor's allegedly improper question satisfies the *Giglio* materiality standard. We reject each in turn. First appellant asserts that if the jury had been apprised of the DEA notes, it could have equated the transaction referred to in the notes with the drugs seized by the MPD, whether or not Bailey admitted to receiving 62 grams of cocaine on the stand. However, appellant admitted ownership of these specific drugs not merely in his guilty plea, but also in his more detailed debriefing session with the DEA. Moreover, Bailey did testify to purchasing large amounts of crack cocaine on previous occasions. Even if the jury had been made aware that she told the DEA agent that she had received 62 grams from Phil at some point, we do not believe that this additional admission would have cast any appreciable doubt upon the solid evidence establishing

appellant's guilt. Second, appellant claims that the prosecutor's question served to rehabilitate Bailey's credibility as a witness, such that the jury was more likely to credit her testimony against appellant. However, at this point Bailey's credibility had been thoroughly compromised by her own admissions of prior drug use and dealing, and we doubt any attempt at rehabilitation—if that it was—through rephrasing a single question peripheral to the main issue of the trial could have influenced the jury in its final verdict.[16] *See* discussion *infra* pp. 1328–29.

### III. Conclusion

For reasons explained, we reject all of Burch's contentions and affirm his conviction. Because appellant has failed to make a substantial showing of the denial of any constitutional right, we decline to issue a certificate of appealability and affirm the dismissal of his petition for a writ of habeas corpus.

*So ordered.*

**15.** Without passing judgment on this question, we note that the district court, in addressing appellant's § 2255 motion, specifically concluded that the prosecutor did not knowingly sponsor false testimony. "We still don't know that this is false testimony.... Nothing I've heard in the last two days indicates to me that there was false testimony given at trial." 11/7/97 Tr. at 20–21.

**16.** By contrast, in *Giglio* and *Napue*, prosecution witnesses falsely denied that they had been promised lenient treatment, *see Giglio*, 405 U.S. at 152–53, 92 S.Ct. 763, and a recommendation of a reduced sentence, *see Napue*, 360 U.S. at 266–67, 79 S.Ct. 1173, in return for their testimony.