**UNITED STATES of America,**

v.

**Daniel CHAPARRO, Defendant.**

**No. 00 CR 432 (DLC).**

United States District Court,
S.D. New York.

Jan. 9, 2002.

Steven R. Glaser, Office of the United States Attorney, Southern District of New York, New York City, for United States.

Stephanie M. Carvlin, New York City, for Defendant.

---

## OPINION AND ORDER

COTE, District Judge.

Having been unsuccessful in his effort to obtain a cooperation agreement from the United States Attorney's Office (the "Government"), defendant Daniel Chaparro ("Chaparro") has moved for a Section 5K2.0 downward departure at his sentence based on substantial assistance he provided to the Bronx District Attorney's Office ("DA's Office") in its prosecution of a murder case. The Government has opposed the motion, relying in part on statements Chaparro made during proffer sessions not only to the DA's Office but also to the Government. It contends that Chaparro's statements demonstrate that Chaparro was not entirely truthful when speaking with the DA's Office. Chaparro now seeks to preclude the Government from relying on the statements he made during these proffer sessions. Chaparro's motion to preclude is denied.

## BACKGROUND

For years, brothers Oscar and Edgar Ortega (the "Ortegas") ran a heroin and crack cocaine trafficking operation near 156th Street and Union Avenue in the Bronx, New York. Oscar Ortega, the leader of the organization, set prices, distributed drugs to his managers and collected proceeds from drug sales. Edgar Ortega assisted Oscar with the daily operation of the organization, supplied the managers with drugs, offered discounts for purchases of larger quantities of drugs, collected money from drug sales and acted as a lookout for the organization.

With the exception of those months in which he was incarcerated for narcotics convictions, Chaparro worked for the Ortegas during the 1990s until his arrest on May 10, 2000. Chaparro and Gilbert Ruiz ("Ruiz") were managers in the Ortegas' organization. Ruiz managed the day shift and Chaparro managed the evening shift. As managers, Chaparro and Ruiz recruited, trained and supervised "pitchers" (individuals who sold drugs hand-to-hand), distributed drugs to the pitchers, collected and divided the money from the sales and submitted the profits to the Ortegas. Typically, at the conclusion of his shift, Chaparro would provide the Ortegas with thousands of dollars from drug sales. Chaparro often recruited pitchers from the nearby junior high school, Public School 184. Andres Martinez ("Martinez") and Angel Gonzalez ("Gonzalez") worked as pitchers.

On April 25, 2000, a federal grand jury indicted six members of the Ortegas' organization in eight counts for violations of federal narcotics laws. Chaparro was indicted in four counts.[1] Among other

---

1. Count One charged Chaparro with conspiracy to distribute and possess with intent to distribute crack cocaine and heroin, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B) and (C). Counts Six and Eight charged him with distribution and possession with intent to distribute heroin and crack cocaine within one thousand feet of a school, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(C), and 860. Count Seven charged

things, the indictment charged that the Ortegas, Chaparro, Ruiz, Martinez and Gonzalez were part of a conspiracy to distribute cocaine and heroin. The Ortegas and Chaparro were arrested on May 10, 2000; Martinez on May 18, 2000; Ruiz on October 17, 2000; and Gonzalez on November 30, 2000. At all times since his arrest, Chaparro has been represented by assigned counsel.

On July 18, 2000, approximately two months following his arrest, Chaparro asked for and attended a meeting with the Government to discuss his possible cooperation with the federal authorities. At the beginning of the meeting, which is also referred to as a proffer session,[2] Chaparro and the Government executed the Government's standard two page proffer agreement (the "Agreement"), in which Chaparro agreed to "provide the Government with information, and to respond to questions, so that the Government may evaluate [his] information and responses in making prosecutive decisions." The Agreement limited the use that the Government could make of Chaparro's statements, in essence, excluding their use as direct proof, but permitting their use in rebuttal, including at the time of sentencing. Specifically, the Government agreed that

> [s]hould any prosecutions by brought against [Chaparro] by this Office, the

Government will not offer in evidence on its case-in-chief, or in connection with any sentencing proceeding for the purpose of determining an appropriate sentence, any statements made by [Chaparro] at the meeting . . . .

The Agreement further provided that, notwithstanding this provision, the Government

> *may use statements made by [Chaparro] at the meeting and all evidence obtained directly or indirectly therefrom . . . to rebut any evidence or arguments offered by or on behalf of [Chaparro]* (including arguments made or issues raised *sua sponte* by the District Court) *at any stage of the criminal prosecution* (*including* bail, trial, and *sentencing* ) should any prosecution of [Chaparro] be undertaken.

(Emphasis in original and supplied.) The Agreement was signed by Chaparro, his attorney Jennifer Brown, Assistant United States Attorney Steven Glaser and a witness.

During the July 18 session, Chaparro began, without prompting, to discuss the murder two years earlier of eighteen year old Jose Perez.[3] Chaparro had refused to cooperate with the police regarding the Perez murder prior to his federal indictment. At the July 18 session, however,

---

him with employing and inducing individuals under eighteen years of age to distribute and possess with intent to distribute crack cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(C), and 861(a)(1).

**2.** The term "proffer session" is generally applied to those interviews in which a defendant submits to questioning by prosecutors in the hope of receiving a benefit from the Government, such as a decision to offer a defendant a cooperation agreement or a representation from the Government that a defendant qualifies for the safety valve provision of the law by having provided truthful information to the Government. *See* 18 U.S.C. § 3553(f).

**3.** Chaparro, Edgar Ortega and others were playing cards on a sidewalk in the Bronx when Perez was shot on July 3, 1998, by members of a rival drug gang, Jamal Smalls and Jamal Brooks ("Smalls" and "Brooks"). Brooks and Smalls each fired a shot at the card table. The attack was in retaliation for the beating the night before of an individual, Sean, who worked for the rival gang. Sean was beaten by the Ortegas, Chaparro, and others because he was working for the rival gang at the same time he was working for the Ortegas.

Chaparro stated that he knew that two men were being prosecuted for the murder and that the case was close to trial. While Chaparro admitted working in a drug distribution operation, he claimed that he had worked for the murder victim, Perez, and had no "knowledge" of the Ortegas' drug dealing activities, although he admitted that he had "suspicions" that the Ortegas might be involved in drug dealing.[4] He also denied his involvement in the events that led to his prior arrest by the police on February 11, 2000.[5] Chaparro, Gonzalez and a juvenile were arrested on February 11, 2000, after Chaparro was observed putting objects that later tested positive for crack cocaine and heroin in a false step of a residential building, handing a bag of cash to Gonzalez and instructing him to run.

Shortly thereafter, in a taped conversation between Chaparro and his co-defendant Oscar Ortega on July 31, 2000, Chaparro explained to Oscar Ortega that he had met with the Government to obtain a "5K1," and had given the Government information about the Perez murder, but assured Oscar Ortega that he had denied having any information about the Ortegas' involvement in drug activities. Chaparro explained that a "5K1" was "[w]hen you snitch and they . . . send a letter to the judge . . . and they cut your time." Chaparro stated further that "it's not snitching, though. It's just helping yourself out." Chaparro stated that he "talked about it and I told him everything about it," referring to the Perez murder. Chaparro stated that "if they use it, they gotta give me the letter." He also informed Oscar Ortega that he had been questioned

about the Ortegas' drug dealing activities, and that he had responded by stating that

I don't know because I never, I never dealt with him. I never went up to them and asked them you know . . . . It was none of my business . . . So he [the AUSA] was like oh, but you never? No I never . . . I've never seen nothin . . . they always kept to themselves. You know they're brothers . . . . He said so, so, where did this guy get? I don't know . . . . And then he was like but you never seen? No man. So how about, how about, how about this, this and that. I was like no I never seen that. And then I got it. And I got it from this and that. You understand what I'm saying right?

Chaparro explained further to Oscar Ortega: "Basically I told him nothing, you know what I'm saying?"

Meanwhile, having concluded that Chaparro was not truthful during the July 18 proffer session, the Government declined to offer him a cooperation agreement. The Government did inform the DA's Office, however, that Chaparro had information regarding the Perez murder, although it also conveyed the Government's view that Chaparro had "serious credibility problems." Assistant District Attorney Nancy Borko ("ADA Borko") expressed an interest in meeting with Chaparro. At the request of Chaparro and ADA Borko, a proffer session was held at the United States Attorney's Office on September 8, 2000. Chaparro, defense attorney Brown, AUSA Glaser and ADA Borko were present at that meeting. The Agreement was re-executed and re-initialed at the September 8 meeting by Chaparro, Brown, Glaser

---

**4.** Chaparro has not yet taken issue with the Government's description of his statements during proffer sessions. Should he do so, a *Fatico* hearing will be conducted to resolve any disputed issue of fact.

**5.** On January 17, 2001, Chaparro pleaded guilty to distributing crack on February 11, 2000.

and a witness. Neither the Government nor defense counsel has described what was said during this interview.

A third and final proffer session, attended by Chaparro, Brown, Glaser and Borko, was held at the United States Attorney's Office on October 3, 2000. The Agreement was re-initialed and re-executed by Brown, Chaparro and Glaser. At that proffer session, Chaparro stated that he had no "information" that the Ortegas "dealt drugs" and that he had "never worked" for the Ortegas. The Government informed Chaparro that it would no longer meet with him or facilitate his meetings with the DA's Office.

The DA's Office and Chaparro thereafter agreed that the DA's Office would limit its questioning to the Perez murder and would not inquire about the pending federal drug charges. An additional interview without the Government's involvement took place at the DA's Office on October 16, 2000. At that meeting, Chaparro told ADA Borko under oath that Perez was murdered by rival drug dealers in retaliation for Sean's beating. Chaparro acknowledged that Edgar Ortega was present at Perez's murder and that the Ortegas took part in Sean's beating. When questioned by ADA Borko about why Sean was attacked, however, Chaparro replied that Sean had been working for "us," which he promptly amended to identify as himself, Perez, and a third individual named Abraham Carrera ("Carrera"). Chaparro did not reveal that he, Perez and Sean all worked for the Ortegas, or that the Ortegas had beaten Sean because

he had betrayed them by also working for the rival organization.

ADA Borko informed the Government that she intended to call Chaparro as a witness, but would not question him about his drug dealing. She assumed that Chaparro would assert his Fifth Amendment rights if questioned about his involvement in or knowledge of the Ortegas' drug operation. Although Chaparro had agreed to testify in the Perez case, he did not do so; having been informed that Chaparro and others were prepared to testify, Smalls and Brooks pleaded guilty to second degree manslaughter on October 24, 2000.

A trial date of November 13, 2000, had been set in this case on June 9, 2000. Because of the arrest of Ruiz, on October 23, the trial date was reset for January 22, 2001. All of the defendants except Edgar Ortega pleaded guilty between December 27, 2000 and January 17, 2001. Oscar Ortega and Ruiz pleaded guilty on December 27, 2000; Martinez on January 12, 2001; and Gonzalez and Chaparro on January 17, 2001. Chaparro pleaded guilty to Counts One, Six and Eight of his indictment without the benefit of a plea agreement.[6] Chaparro is a Career Offender. The *Pimentel*[7] letter the Government provided to Chaparro prior to his plea reflected the Government's calculation of a guidelines range of 360 months to life. Edgar Ortega was found guilty on January 25, 2001, by a jury.

*Chaparro's Motion*

Chaparro has moved for a Section 5K2.0 departure based on his substantial assistance to the DA's Office. *See United*

---

6. Chaparro was represented by assigned counsel Robert Koppelman at the time of his plea. On July 17, 2001, his current attorney was assigned to represent him.

7. Pursuant to the recommendation in *United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir.1991), it is the Government's practice in the Southern District of New York to provide a defendant prior to her entry of a plea of guilty with its calculation of her sentencing guidelines range based on the information then at its disposal.

*States v. Kaye*, 140 F.3d 86, 88–89 (2d Cir.1998). He contends that in considering the extent of a departure, this Court should weigh those factors relevant to a departure pursuant to Section 5K1.1, including "the truthfulness, completeness, and reliability of any information or testimony provided by the defendant," as well as "the nature and extent of the defendant's assistance." U.S. Sentencing Guidelines Manual § 5K1.1(a)(2), (3) (2001).

In support of his request for a departure, Chaparro makes the following statements regarding his cooperation with the DA's Office:

- "Ms. Borko found Mr. Chaparro's information credible."
- "In Ms. Borko's estimation, Mr. Chaparro provided truthful and complete information."
- "While Mr. Chaparro did not actually testify, Ms. Borko prepared him to do so. She intended to use his testimony, which in her view was truthful, at trial. Indeed, the truthfulness of Mr. Chaparro's account is demonstrated circumstantially . . . ."
- "Mr. Chaparro provided truthful and complete information in the prosecution of two men."

In addition to the evidence and statements that directly refer to the veracity and completeness of his assistance, Chaparro also states that he "agreed to testify at trial against the two defendants" and that he "prepared to testify and stood ready to do so."

Chaparro has submitted a letter from ADA Borko in which the ADA described Chaparro's initial refusal to cooperate and his decision to cooperate after federal charges were filed:

Mr. Chaparro had always been unwilling to work with the Detectives assigned to this homicide. However, at some point, Mr. Chaparro decided to work with the Government to benefit himself and law enforcement.

ADA Borko acknowledged the limited nature of Chaparro's assistance to the DA's Office:

The information that [Chaparro] was able to supply the government was only in relation to the death of Mr. Perez. Although his cooperation agreement with the Government did not come to fruition, he did continue to assist this office in it's [sic] prosecution of Mr. Brooks and Mr. Smalls.

The ADA emphasized the truthfulness, completeness and importance of Chaparro's assistance to the DA's Office in its prosecution of Smalls and Brooks:

Mr. Chaparro gave a full account of all the events he knew that may have related to the murder. He also gave a sworn statement as to exactly what he saw and heard when the murder occurred. . . . [Chaparro's] eventual willingness to testify and giving us the information to locate other witnesses proved invaluable for the aforementioned prosecution.

In his submissions, Chaparro also made a number of statements about his attempt to cooperate with federal authorities:

- "Eager to improve his situation, he [Chaparro] sought to cooperate with federal authorities."
- "Ms. Brown [Chaparro's attorney] explored the prospect of having Mr. Chaparro cooperate with the Government."
- "[Chaparro] met with the Government with an eye toward cooperation."

The submissions explained the absence of a cooperation agreement with the Government in the following way: "The federal government apparently did not find Mr.

Chaparro credible with respect to his involvement in the conspiracy charged in this indictment and declined to enter into a cooperation agreement with him."

Relying, in part, on statements Chaparro made during the proffer sessions on July 18 and October 3, 2000, the Government maintains that Chaparro's request for a departure should not be granted because he did not provide truthful or complete information to state authorities. Arguing that Chaparro engaged in a cynical scheme to win a departure by providing evidence only against members of a rival drug organization, the Government contends that Chaparro did not truthfully describe the Ortegas' narcotics activity even when it was necessary to describe the motive for the murder accurately and to explain the presence of the Ortegas at Sean's beating, and argues that Chaparro would have perjured himself if called to testify at the state murder trial.

Chaparro has opposed the introduction of his proffer session statements on the ground that these statements are privileged under Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(e)(6), and that that privilege was waived through the execution of the proffer agreement only to the extent that Chaparro's statements during the interviews "directly and squarely" rebut arguments he has made at sentence. In essence, the parties dispute whether Chaparro has waived the protection of Rules 410 and 11(e)(6) by virtue of the arguments he makes or evidence he submits in support of his request for a departure.

## DISCUSSION

■ Although a defendant's statements made during plea negotiations may not ordinarily be admitted against him under Rules 410 and 11(e)(6), "an agreement to waive the exclusionary provisions of the plea-statement Rules is valid and enforceable" at least so long as the agreement is entered knowingly and voluntarily. *United States v. Mezzanatto*, 513 U.S. 196, 210, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995). There is no claim by Chaparro that he entered into the Agreement unknowingly or involuntarily; he was represented by counsel each time he signed the proffer Agreement, and his counsel also signed the Agreement.

■ Agreements between the Government and a criminal defendant "are interpreted according to principles of contract law." *United States v. Gregory*, 245 F.3d 160, 165 (2d Cir.2001) (citation omitted) (cooperation agreement); *see also United States v. Liranzo*, 944 F.2d 73, 77 (2d Cir.1991) (proffer agreement). Nonetheless, because agreements between a defendant and the Government are "unique contracts in which special due process concerns for fairness and the adequacy of procedural safeguards obtain," *United States v. Ready*, 82 F.3d 551, 558 (2d Cir. 1996) (citation omitted), courts must "resolve any ambiguities in the agreement against the government," *United States v. Rodgers*, 101 F.3d 247, 253 (2d Cir.1996); *see also Gregory*, 245 F.3d at 165. The Government is held "to the most meticulous standards of both promise and performance." *United States v. Altro (In re Altro)*, 180 F.3d 372, 375 (2d Cir.1999) (citation omitted) (enforcing integration clause in plea agreement).

The terms of the Agreement at issue here are not ambiguous, and Chaparro does not suggest otherwise. The Agreement allows the Government to rely on Chaparro's proffer statements to "rebut any evidence or arguments offered by or on" Chaparro's behalf at sentencing. Thus, Chaparro has waived the protection of Rules 410 and 11(e)(6) to the extent his statements rebut any argument he ad-

vances or evidence he presents in favor of his Section 5K2.0 departure motion.

It is worth noting in the first instance that the defendant does not dispute that the Government is entitled to rely on a significant amount of the evidence to which it points in opposing the departure motion. This includes Chaparro's telephone call to Oscar Ortega explaining that, although he had met with the Government to obtain a departure by talking about the murder, he had lied to protect the Ortegas. In addition, the Government is clearly entitled to rely on the transcript of the October 16 meeting with ADA Borko in which Chaparro answered questions under oath. At that session, Chaparro said that Sean was beaten because he was working for Perez, Chaparro and Carrera, and omitted any disclosure about the Ortegas' ownership and management of the drug organization or explanation for their presence at Sean's beating. This motion addresses the propriety of the Government's use of Chaparro's statements on two other occasions: July 18 and October 3.

### 1. *October 3, 2000 Session with ADA Borko and the Government*

■ Taking the two sessions in reverse chronological order, Chaparro contends, in reliance on the terms of the Agreement executed that day, that the Government may not describe his statements on October 3, 2001, even though those statements were made to ADA Borko as well as to the federal authorities since both were present that day. Chaparro's statements may be admitted if they rebut arguments he has made or evidence he has submitted in support of his motion for a departure. In support of his motion, Chaparro has argued that he "provided *truthful* and *complete* information" to ADA Borko, and has submitted evidence that he gave ADA Borko "a *full account* of *all the events* he knew

*that may have related to the murder."* (Emphasis added.) At the proffer session on October 3, 2001, Chaparro told ADA Borko that he had no information that the Ortegas dealt drugs and that he had never worked for the Ortegas.

Chaparro's statements of October 3 rebut arguments and evidence he submitted in support of his motion for a departure. First, the fact that Chaparro lied to ADA Borko directly rebuts his contention that he provided "truthful" information to the DA's Office. Second, Chaparro's employment by the Ortegas and his information regarding the Ortegas' drug activities are clearly relevant to the Perez murder, including, but not limited to, the motives of the individuals accused of the murder. Chaparro's statements thus fairly and directly rebut his argument that he provided ADA Borko with a "full account" of "all the events" he knew that "may have related" to Perez's murder.

In addition, Chaparro maintains that in considering his motion for a departure, this Court should apply those factors relevant to a departure pursuant to Section 5K1.1, including "the truthfulness, completeness, and reliability of any information or testimony provided by the defendant," as well as "the nature and extent of the defendant's assistance." U.S. Sentencing Guidelines Manual § 5K1.1(a)(2), (3) (2001). By requesting the Court to consider Section 5K1.1 factors in evaluating his motion for a departure, Chaparro has waived the protection of the Agreement to the extent that the statements he made to the ADA on October 3 are relevant to the truthfulness, completeness, reliability, nature and extent of the assistance he has described giving to the DA's Office.

### 2. *July 18, 2000 Proffer Session with the Government*

The Government has also relied on statements made by Chaparro on July 18,

2000, during the first interview covered by the Agreement. ADA Borko was not present at this interview.

■ The Government argues that Chaparro's statements during this interview may be used to rebut three statements made in support of his departure motion regarding his effort to cooperate with federal authorities: that he "sought to cooperate with federal authorities," that his attorney "explored the prospect" of having him cooperate, and that he met with the Government with "an eye toward cooperation." Chaparro's lies on July 18 regarding his own and the Ortegas' drug activities demonstrate that Chaparro did not seek to cooperate with the federal authorities in good faith. *Cf. United States v. Reynoso*, 239 F.3d 143, 148 (2d Cir.2000) (Congress did not intend to reward a defendant who trades on false information). To the extent that Chaparro's explanation for the Government's failure to offer him a cooperation agreement—that "the federal government apparently did not find Mr. Chaparro credible"—implies that Chaparro was truthful but that the Government did not consider him so, then that statement also allows the Government to offer evidence of the July 18 statements in rebuttal.

Chaparro maintains, however, that the statements in his initial submissions simply describe his acts of contacting and meeting with the Government and were provided solely as background. His most recent submission acknowledges that Chaparro did *not* do "what was required" to receive a cooperation agreement, and argues that his submissions were "quite frank" with the Court in this regard.

It is commonly understood that there are two principal requirements for a defendant to receive a cooperation agreement from the Government: 1) truthful disclosure of your own criminal activity and that known to you in which others have engaged, and 2) a sufficient likelihood of being able to provide substantial assistance in the prosecution of others. *See United States v. Doe*, No. 96 Cr. 749(JG), 1999 WL 243627, at *10 (E.D.N.Y. Apr. 1, 1999). The former requirement of full and honest disclosure is necessary for a number of reasons, including all of the reasons which mandate that the Government not present perjurious testimony through its witnesses. To the extent that there was any ambiguity in the defendant's original submission in support of his departure motion, it is now evident that he is not contending that he was truthful when speaking with the federal authorities. With that clarification, the Government may not offer Chaparro's statements at the July 18 meeting on the issue of whether he sought to cooperate in good faith with the federal authorities.

■ The only remaining issue is whether Chaparro's lies to the Government on July 18 may be used as circumstantial evidence to rebut his arguments and evidence concerning the veracity and completeness of his state cooperation. They are not direct evidence on this point since ADA Borko did not attend this interview. The Government contends that Chaparro's lies on July 18 make it more likely that his omissions and untruthful statements to the DA's Office were not inadvertent, but were instead part of a calculated effort to win a sentencing reduction by providing information against rivals while protecting himself to some extent, and more importantly his bosses, through lies.

The Agreement provides that the Government may use the defendant's statements "to rebut any evidence or arguments offered by or on behalf of Client (including arguments raised or issues raised *sua sponte* by the District Court) at any stage" of the prosecution, including at

sentence. Even when construed against the Government, this is a broadly worded waiver. The defendant's own definition of the word rebut—"to contradict or oppose by formal legal argument, plea or countervailing proof; to expose the falsity of"— indicates that the use of the July 18 statements to show that Chaparro intentionally lied in later statements to the DA's Office would "rebut" Chaparro's arguments and evidence that he had been truthful and complete when speaking with the ADA. That is, his July 18 statements assist in contradicting, opposing, and exposing the falsity of his contentions in that regard.

Consideration of the defendant's statements on July 18 is also relevant to the argument that a departure is warranted because the defendant stood ready to testify at the murder trial. This argument is composed of many parts, including the contention that a significant departure is warranted because of the risk that the defendant took by having murderers learn of his cooperation. But, another essential even if implicit part of the argument is that the defendant was prepared to testify truthfully and would not have committed perjury. It is inconceivable that Chaparro's examination at the murder trial would have avoided questioning about his criminal past, the drug organization for which he and the murder victim both worked, and the motives each participant—including the Ortegas—had for beating Sean the night before the murder. While the prosecutor · may have believed that she could fashion an effective direct examination of Chaparro in a way that would not elicit false testimony, the best she hoped for cross examination was that Chaparro would refuse to answer questions by invok-

ing his Fifth Amendment rights. Of course, it is impossible to know how Chaparro would have testified if called: whether he would have answered all questions truthfully, committed perjury, or invoked his Fifth Amendment rights, and in the latter case, whether his entire testimony would have been stricken. What is known, however, is that it would be misleading to argue that Chaparro is entitled to a departure because he was prepared to testify at the murder trial, and by implication, to testify truthfully, without also informing the Court that at no time prior to the time that his testimony became unnecessary had Chaparro truthfully described to the state prosecutors all the events and relationships that were likely to be the subject of examination at the murder trial.

Information regarding a defendant's veracity is not only significant because Chaparro has urged that the Court evaluate the completeness, reliability, and extent of his assistance to the state prosecutors, it is crucial in the context of any departure based on substantial assistance to prosecutors. Defendants who receive departures based on such substantial assistance frequently receive reductions in their sentences significantly below the guidelines range that would otherwise apply.[8] While some reduction is justified by the benefits that such cooperation yields for society in the discovery and prosecution of other criminals, and the need to provide a continuing incentive for such disclosures, the extent of reduction is at least as attributable to what the decision to cooperate indicates about an individual defendant's character. The decision to disclose truthfully all that you know about the criminal activi-

---

**8.** Between October 1, 1999 and September 30, 2000, the median percentage decrease in sentences for defendants convicted of drug trafficking offenses who received a departure for substantial assistance under Section 5K1.1 was 47.8% from the lowest end of their guidelines range. U.S. Sentencing Comm'n, *2000 Sourcebook of Federal Sentencing Statistics* 61 tbl. 30 (2000) (hereafter *"Sourcebook"*).

ty of yourself and others, and to testify if necessary in open court in a prosecution of your former confederates is a strong indicator of remorse and reform. At a minimum, a defendant who makes such a decision has cut her ties with her partners in crime, and will find it harder to return to crime, at least in their company. Because the character of the defendant and her potential for rehabilitation are at the heart of individualized sentencing, *see United States v. Merritt,* 988 F.2d 1298, 1307 (2d Cir.1993), it is important for the Court to understand these issues as accurately and completely as possible.

At the same time, however, because a defendant waives important rights when she signs an agreement with the Government, courts must be particularly concerned with fairness to the defendant when interpreting and enforcing such agreements:

> Our concern for fairness is rooted in an appreciation of the fact that, unlike ordinary contracts, plea agreements call for defendants to waive fundamental constitutional rights, and in an awareness that the Government generally drafts the agreement and enjoys significant advantages in bargaining power.

*Altro,* 180 F.3d at 375. In this case, however, not only the language, but the entire structure of the Agreement indicates that there is no unfairness to Chaparro in allowing use of his statements during proffer sessions once he has opened the door to their use by his arguments and evidence. The design of the Agreement provides any defendant who decides to speak with the Government strong incentives to speak truthfully, and discourages anyone from speaking at all if she intends to lie or intends at a later time in the prosecution to advocate a position at odds with the facts she describes during the proffer session. *See United States v. Perrone,* 936 F.2d 1403, 1411–12 (2d Cir.), *clarified on reh'g,* 949 F.2d 36 (2d Cir.1991) (approving impeachment of defendant's testimony at trial through witness's description of the defendant's statements covered by proffer agreement).

There are significant benefits to both the defendant and the Government from structuring proffer sessions in this way. Many of these interviews are undertaken when defendants seek to convince the Government to enter into a cooperation agreement with them.[9] *See United States v. Cruz,* 156 F.3d 366, 370 (2d Cir.1998). If successful in winning a cooperation agreement, there can be enormous benefits to a defendant.[10] In drug cases, in particular, cooperation with the Government can allow sentencing below a mandatory minimum term of imprisonment that would otherwise apply.[11] In all cases, there can be

---

**9.** Interviews protected by proffer agreements may also occur when defendants seek to convince the Government of their innocence, to win the benefits of the safety valve provision of the law, *see Reynoso,* 239 F.3d at 145; *Cruz,* 156 F.3d at 370, to reach agreement on a guidelines stipulation on a particular sentencing issue, and for other purposes.

**10.** For the year ending September 30, 2000, federal prosecutors made 5K1.1 departure motions for 18.8% of the defendants in the Southern District of New York, and for 17.9% of the defendants prosecuted nationally. For those defendants convicted of drug trafficking offenses, the figures are 23% for the Southern District of New York, U.S. Sentencing Comm'n, *Federal Sentencing Statistics by State: New York Southern* 14 tbl. 9 (2000), *available at* http://www.ussc.gov/JUD-PACK/JP2000.htm, and 27.8% nationally, *Sourcebook* 56 tbl. 27.

**11.** A defendant may also be sentenced without regard to the applicable statutory minimum if a defendant is in the lowest criminal history category, truthfully discloses what she knows about the offenses of conviction, and otherwise meets the criteria of the "safety valve"

very substantial departures for defendants who procure 5K1.1 motions from the Government. Because defendants, their counsel, and the Government all understand the risk a defendant is taking in submitting to an interview governed by the Proffer Agreement, the defendant's credibility when speaking is significantly enhanced. *United States v. Krilich*, 159 F.3d 1020, 1025 (7th Cir.1998). In essence, because of the terms of the Proffer Agreement, when requesting such interviews a defendant makes a statement that she is willing to allow the remainder of her prosecution to be judged against the truth of what she describes in the interview.

While courts must consider general fairness principles in interpreting and enforcing agreements between defendants and the Government,

> with respect to federal prosecutions, the courts' concerns run even wider than protection of the defendant's individual constitutional rights—to concerns for the honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government.

*Ready*, 82 F.3d at 558 (citation omitted). Structuring the Agreement to provide incentives for a defendant to speak during the proffer session only if she is speaking truthfully furthers the goals articulated in *Ready*. As already described, the risks a defendant takes if she lies during a proffer session enhance her credibility and assist in giving her access to significant benefits in her prosecution. So long as the defendant makes the commitment contained in

the proffer agreement knowingly and voluntarily and there is no Government overreaching in enforcing the agreement, its terms promote a search for the truth. If the Government enters into a cooperation agreement with a defendant and acts upon that defendant's information in the prosecution of others, and only later discovers that the defendant has lied, the system of justice is injured, the lives of others may be wrongly and seriously impacted, and in some cases, extensive collateral litigation ensues.[12] If a defendant has spoken truthfully, the Government may be able to make far better decisions regarding what agreements to reach in the individual defendant's case, about how to deploy its resources in the prosecution of others, and in the investigation of crime.

Enforcing proffer agreements will also enhance the integrity of the judicial truth-seeking function. *See Mezzanatto*, 513 U.S. at 205, 115 S.Ct. 797. In fact, the Second Circuit has observed that an agreement that would keep a sentencing judge

> ignorant of pertinent information cannot be enforceable, because a sentencing court must be permitted to consider any and all information that reasonably might bear on the proper sentence for the particular defendant, given the crime committed.

*United States v. Fagge*, 101 F.3d 232, 234 n. 1 (2d Cir.1996) (citation omitted). Excluding Chaparro's statements would deprive the Court of information relevant to the defendant's claim that his assistance to the DA's Office warrants a downward departure in his sentence. *See United States v. Casamento*, 887 F.2d 1141, 1182 (2d

---

provision of the law. 18 U.S.C. § 3553(f); *see also Cruz*, 156 F.3d at 375.

**12.** The collateral litigation can include litigation over whether the Government has acted in good faith in refusing to make a 5K1.1 motion at the time of sentence for a defendant

it has come to believe has lied, and motions for a new trial by a convicted defendant on the ground that a trial witness who was cooperating with the Government committed perjury.

Cir.1989) (enforcing Government's reservation of right to respond at sentence). To prevent this "perverse result," the waiver provisions in the Agreement Chaparro signed insure that the Court will "not sentence him in the dark" with respect to any argument Chaparro chooses to make at sentence. *Doe,* 1999 WL 243627, at *11. In essence, they insure Chaparro will not "get away with a lie." *Cruz,* 156 F.3d at 371.

Relying on *United States v. Duffy,* 133 F.Supp.2d 213 (E.D.N.Y.2001), Chaparro argues that the Agreement's waiver must be carefully circumscribed to avoid infringing his constitutional rights to present a defense and to the effective assistance of counsel. *Duffy* held that the waiver provisions of the proffer agreement it was considering were not enforceable at trial beyond permitting the Government to impeach the defendant with statements made during the proffer sessions. *Id.* at 218. Other courts have reached different conclusions and have enforced similar waiver provisions. *See, e.g., Krilich,* 159 F.3d at 1026; *United States v. Burch,* 156 F.3d 1315, 1322 (D.C.Cir.1998). This is a debate that Chaparro's motion does not require this Court to resolve. The extent to which the Government may use a defendant's proffer statements at trial to rebut arguments and evidence offered on behalf of the defendant is not presented here.

There remains one possible exception to this ruling. It would not be appropriate to use the July 18 and October 3 statements by Chaparro if he withdraws his contentions that he was truthful in everything that he said to the ADA, including his description of the circumstances that caused Sean's beating and the retaliatory shooting. As it now stands, Chaparro's submissions argue that Chaparro was truthful when he spoke with the DA's Of-

fice, including in his description of the events that relate to the murder, and that a departure should be based on an evaluation of, among other things, the extent of his cooperation with the DA's Office. Any fair reading of this argument opens the door to Chaparro's statements on July 18 and October 3. What Chaparro cannot do, even through implication, is represent that he provided complete and truthful cooperation to the DA's Office and then deprive the Government of the ability to contest that representation or the Court of the ability to evaluate it. If, however, Chaparro makes a more narrow argument, such as arguing that he accurately described to the DA's Office the events that he observed on the day of the murder, it would not be appropriate to allow the Government to reveal the statements Chaparro made on July 18 and October 3 under the protection of the Agreement. As defense counsel herself observes, "[a] defendant should not be permitted to hide behind the protection of a proffer agreement to defraud a Court and undermine the truth-seeking function."

## CONCLUSION

For the reasons stated above, the Government may introduce Chaparro's statements from the July 18 and October 3 proffer sessions unless Chaparro narrows his arguments in support of his Section 5K2.0 departure motion so that these statements are no longer relevant rebuttal. Chaparro's motion to preclude is denied.

SO ORDERED: