UNITED STATES of America,

v.

**Brian DUFFY, Defendant.**

No. 99 CR 589.

United States District Court, E.D. New York.

March 13, 2001.

Patricia Notopoulos, United States Attorney's Office, Criminal Division, Brooklyn, NY, for U.S.

Joseph R. Corozzo, Jr., Alberto A. Ebanks, Ebanks & Sattler, LLP, New York City, for Brian Duffy.

### OPINION AND ORDER

GERSHON, District Judge.

This opinion sets forth the basis for my October 13, 2000 order striking paragraph 2(C) from the proffer agreement entered into between the defendant Brian Duffy and the government on July 13, 1999.

On July 13, 1999, Duffy and his attorney went to the United States Attorney's Office in hopes of negotiating a cooperation agreement.[1] Ordinarily, the government will not agree to enter into a cooperation agreement until a defendant makes a factual proffer and describes the type of assistance he might be able to provide. Before beginning a proffer session, the government required Duffy and his lawyer to execute what is referred to by the government as its "standard proffer agreement." The government acknowledges that it uses this standard proffer agreement "during every proffer session with all defendants," and that it is not negotiable. See Oct. 11, 2000 Tr. at 40.

Paragraph 1 of the government's standard proffer agreement provides that "[i]n any prosecution brought against [Duffy] by the Office, except a prosecution for false statements, obstruction of justice, or perjury with respect to acts committed or statements made at or after the meeting, the Office will not offer in evidence any statements made by [Duffy] at the meeting (A) in its case-in-chief or (B) at sentencing." Paragraph 2 contains several exceptions to the government's promise to refrain from using Duffy's statements:

> Notwithstanding paragraph (1) above, the Office may use any statements made by [Duffy]: (A) to obtain leads to other evidence, which evidence may be used by the Office in any stage of a criminal prosecution (including but not limited to detention hearing, trial or sentencing), (B) as substantive evidence to cross-examine [Duffy], should [Duffy] testify, and (C) as substantive evidence to rebut any evidence offered or elicited, or factual assertions made, by or on behalf of [Duffy] at any stage of a criminal prosecution (including but not limited to detention hearing, trial or sentencing).

Paragraph 3 includes an agreement that the exclusionary provisions of Fed. R.Crim.P. 11(e)(6) and Fed.R.Evid. 410 "do not apply to any statements made by [Duffy] at the meeting."

Federal Rule of Criminal Procedure 11(e)(6) and Federal Rule of Evidence 410 are substantively identical. Rule 410 provides:

> "Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissi-

---

1. Duffy was represented by a different attorney on this motion and at trial.

ble against the defendant who made the plea or was a participant in the plea discussions: ... (4) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty ..."

These rules are subject to two express exceptions. A statement made by a criminal defendant in the course of plea discussions is "admissible (i) in any proceeding wherein another statement made in the course of the same plea or plea discussions has been introduced and the statement ought in fairness be considered contemporaneously with it, or (ii) in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record and in the presence of counsel." Fed.R.Evid. 410. *Accord* Fed. R.Crim. Pro. 11(e)(6).

Duffy signed the agreement and then proceeded to give the government a detailed factual proffer. In essence, Duffy admitted the existence of the securities fraud conspiracy that is charged in the instant indictment; he explained how the scheme was carried out, and he described how he joined the conspiracy and the part that he played. Based on the information volunteered, Duffy's counsel asked the government to enter into a cooperation agreement with his client and to permit Duffy to plead guilty to a misdemeanor. The government did not agree, and Duffy proceeded to trial.

Duffy has not challenged any part of the proffer agreement except for paragraph 2(C), which he moves to strike. That is, Duffy has not challenged that part of the agreement which allows the government to use his statements to develop leads or to cross-examine him if he testifies. Duffy cites as the specific grounds for his motion to strike paragraph 2(C) that that provision is ambiguous or, in the alternative, unconscionable. The thrust of his argument, however, is that paragraph 2(C) operates effectively as a waiver of trial, and that he did not knowingly and intelligently

waive his right to make a defense at trial. In response, the government argues that paragraph 2(C) does not prevent Duffy from putting on a defense and states that he will trigger the waiver only if he or his counsel asserts or elicits any statement that contradicts the proffer. According to the government, this means that Duffy's statements become admissible if his counsel were to make a factual assertion that directly contradicts the proffer either during opening argument or on summation or if his counsel were to ask a question of a witness that was designed to and did, in fact, elicit a statement that contradicts the proffer.

While insisting that paragraph 2(C) does not preclude the possibility of a defense, the government concedes that Duffy is left with few options lest he open the door to his proffer statements being used against him. Duffy can argue that the government has not satisfied its burden of proof, and he can generally attack the credibility of the government's witnesses, for example, by challenging their ability to perceive the relevant events or by questioning them about any criminal history they might have. The government additionally agreed, when pressed on oral argument, that a general statement by Duffy's attorney that his client is innocent will not trigger paragraph 2(C).

In *United States v. Mezzanatto*, 513 U.S. 196, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995), the Supreme Court upheld a waiver in which a defendant had agreed that his proffer statements could be used to impeach his own testimony, *i.e.*, a waiver like the one contained in paragraph 2(B) of the government's standard proffer agreement. The Court described Rules 410 and 11(e)(6) as creating a privilege of the defendant and held that, "like other evidentiary privileges, this one may be waived or varied at the defendant's request." *Id.* at 205, 115 S.Ct. 797. *Mezzanatto* did not purport to define the outside limits of a permissible waiver, and, since *Mezzanatto* was decided, two federal Courts of Appeals

have expressed the view that waivers that permit a defendant's proffer statements to be used for more than impeachment purposes are enforceable. *See United States v. Krilich,* 159 F.3d 1020, 1024–26 (7th Cir.1998), *cert. denied,* 528 U.S. 810, 120 S.Ct. 42, 145 L.Ed.2d 38 (1999); *United States v. Burch,* 156 F.3d 1315, 1320–22 (D.C.Cir.1998), *cert. denied,* 526 U.S. 1011, 119 S.Ct. 1155, 143 L.Ed.2d 220 (1999).

Whether the Second Circuit and the Supreme Court will reach the same result as the courts in *Krilich* and *Burch* is doubtful. *See United States v. Doe,* No. 96 CR 749, 1999 WL 243627, \*9 (E.D.N.Y. Apr. 1, 1999) (enforceability of waiver that extends beyond the use of a defendant's statements for impeachment purposes "is subject to question"); *United States v. Fronk,* 173 F.R.D. 59, n.10 (W.D.N.Y.1997) ("it certainly is not clear whether a majority of the Supreme Court would uphold the type of waiver at issue here, one that is not limited to impeachment purposes"). While concluding that *Mezzanatto*'s rationale applied equally to broad waivers of the type involved here, the court in *Burch* distinguished the waiver in that case, which was contained in a plea agreement and executed as a result of successful plea negotiations, and a waiver, like the one here, which was executed as a condition for such negotiations. *See Burch,* 156 F.3d at 1322. In *Krilich,* the Seventh Circuit declined to construe the waiver against the government, a position which, as I will explain, is inconsistent with Second Circuit law. *See Krilich,* 159 F.3d at 1025. Finally, it is significant that three Justices who joined the majority in *Mezzanatto* wrote a separate concurring opinion in which they expressed their concern about a waiver that would permit the government to use a defendant's proffer statements in its case in chief. *See Mezzanatto,* 513 U.S. at 211, 115 S.Ct. 797 (Ginsburg, J., concurring).

Unlike the waiver at issue in *Mezzanatto,* paragraph 2(C) cannot fairly be viewed merely as the waiver of an evidentiary rule. To the contrary, paragraph 2(C) implicates Duffy's Sixth Amendment rights to make a defense and to have the effective assistance of counsel in making that defense. While paragraph 2(C) does not require Duffy's attorney to sit silently at trial, it does prevent him from making any sort of *meaningful* defense. Practically speaking, all that Duffy's counsel can do is to argue reasonable doubt. He can assert that the government's witnesses did not see Duffy doing anything illegal or that those witnesses simply should not be believed. However, any affirmative theory of factual innocence, including, for example, any argument that there was no conspiracy or that Duffy had no part in it, would permit the government to offer Duffy's proffer.

It is commonplace at trial, the government argues, for lawyers to refrain from making certain arguments or from posing particular questions in order to avoid "opening the door" to excluded evidence. Thus, according to the government, paragraph 2(C) does not impose any extraordinary constraints on Duffy's counsel. This analogy is not sound. Even within the narrowly-prescribed areas that the government concedes are fair game, there are nuances and line drawing problems. For me to preview each of defense counsel's questions in advance would be impractical, and, yet, there is no other way for him truly to be certain of the consequences that a particular line of examination will have. I do not see how Duffy's attorney can effectively represent him under these conditions. For these reasons, I find that, under the waiver provision contained in paragraph 2(C), Duffy effectively forfeited fundamental aspects of his rights to make a defense at trial and to the effective assistance of counsel at trial.[2]

**2.** I do not address Duffy's claim that he did not knowingly and voluntarily waive these rights. *Compare United States v. Lauersen,* No. 98CR1134, 2000 WL 1693538, \*7–8

(S.D.N.Y. Nov. 13, 2000). Nor do I address the question whether this defendant could knowingly and voluntarily waive these rights

The Court of Appeals in this circuit views contractual waivers with great care. Even in the context of plea agreements, which include the safeguard of judicially supervised allocutions, the Second Circuit scrutinizes waivers closely and construes them narrowly, especially when they implicate essential rights, for example, as in *United States v. Ready*, 82 F.3d 551, 556 (2d Cir.1996), a defendant's right to an appeal. *See United States v. Padilla*, 186 F.3d 136, 140–41 (2d Cir.1999). As the Second Circuit explained, "In deciding whether to enforce an individual's waiver of a right, courts ask whether the right implicates institutional and societal values that transcend the individual's interests." *Ready*, 82 F.3d at 555. "[E]ven as to evidentiary rulings, a defendant may be deemed incapable of waiving a right that has an overriding impact on public interests." *Id.* (*citing Mezzanatto*, 513 U.S. at 204, 1.15 S.Ct. 797). The *Ready* court held that plea agreements should be construed strictly against the government and that "general fairness principles" could be used to invalidate particular terms. *See id.* at 559.

The government attempts to distinguish *Ready* on the ground that the bargaining power of the parties and the incentives to provide truthful information are different when negotiating a proffer agreement as opposed to a plea agreement. I see no reason not to apply the same principles in both contexts. Indeed, the case for construing proffer agreements against the government is even stronger because proffer agreements, unlike plea agreements, are not subject to any judicial scrutiny before being effectuated. Although Duffy could have waived his right to trial by entering a plea, the government's standard proffer agreement effectively accomplished the same end without affording Duffy the benefit of a plea agreement and the protections of a Rule 11 allocution.

The Second Circuit recognizes that, when engaging in plea negotiations, the government has "certain awesome advantages in bargaining power." *Id.* These disparities are not diminished merely because a defendant is executing a proffer agreement rather than a plea agreement. In fact, the United States Sentencing Guidelines have placed such a premium on cooperation that defendants are under more pressure than ever to proffer in the hope that they will be able to provide "substantial assistance" and secure a more lenient sentence. U.S.S.G. § 5K1.1. Even in a case like this one, which does not involve a statutory mandatory minimum, the power of cooperation to yield a sentence far lower than that otherwise required by the Guidelines is singular. Whether or not a defendant gets this extraordinary sentencing benefit lies largely within the discretion of the government. After all, although it is the court that ultimately decides whether to downwardly depart based on a defendant's cooperation, it can do so only on the motion of the prosecutor. *See United States v. Reina*, 905 F.2d 638, 641 (2d Cir.1990); *United States v. Rexach*, 896 F.2d 710, 713–14 (2d Cir.1990).

Paragraph 2(C) exploits this power imbalance. After signing the standard proffer agreement, the terms of which are dictated by the government, the only thing that a defendant is guaranteed is the chance to convince the prosecutor to enter a deal. At the same time, the defendant bears all of the risk.[3] The government is under no obligation to accept the defen-

---

when he could not have known in advance how paragraph 2(C) would be enforced.

**3.** The imbalance is particularly apparent in this case where plea negotiations broke down, not because the government thought Duffy had been untruthful but, rather, because the

government would not agree to let him plead to only a misdemeanor charge. *Compare Mezzanatto*, 513 U.S. at 199, 115 S.Ct. 797 (government terminated proffer session after confronting defendant with evidence that he was lying).

dant's offer to cooperate, and it loses nothing by declining. If no agreement is reached, the government asserts that it is "waiving the right to use any statements made by the defendant under many circumstances," for example, during its case in chief. Far from leveling the playing field, however, this "waiver" simply places the government in the same position that it would have been in had there been no proffer agreement, because Fed.R.Crim.P. 11(e)(6) and Fed.R.Evid. 410 would have required the same thing.

Nor am I persuaded by the government's remaining arguments. The government's market rationale for paragraph 2(C), borrowed from the Seventh Circuit's decision in *Krilich*, is too speculative a basis for upholding so far reaching a waiver. *Krilich* predicted that a waiver provision similar to paragraph 2(C) would encourage plea bargaining by making a defendant's representations more credible and by strengthening his hand in negotiations. It is equally plausible that paragraph 2(C) would discourage plea bargaining by making the price of aborted negotiations too high for a defendant to bear. *See Mezzanatto*, 513 U.S. at 211, 115 S.Ct. 797 (Ginsburg, J., concurring) (expressing the concern that a waiver permitting the government to use a defendant's proffer statements in its case in chief "would more severely undermine a defendant's incentive to negotiate, and thereby inhibit plea bargaining"). In any event, inferences as to whether the provision encourages or discourages plea bargaining do not address the more fundamental issues discussed earlier.

I also reject the government's claim that enforcing paragraph 2(C) prevents a "fraud on the court." That the Court is aware of facts which will be unknown to the jury is not significantly different from the suppression on constitutional grounds of a defendant's statements or other evidence. Indeed, Rules 11(e)(6) and 410, referred to in *Mezzanatto* as creating a privilege of the defendant, specifically contemplate that statements made by a defendant during plea discussions will be excluded at trial.

In sum, after considering the realistic consequences of paragraph 2(C), I find that the waiver in this case implicates exactly the kind of fundamental interests referred to in *Ready*. Paragraph 2(C), in effect, constitutes a waiver of Duffy's rights to make a defense and to the effective assistance of counsel. To permit the government to extract a waiver of such important rights as a precondition to engaging in cooperation negotiations would have "an overriding impact on public interests" in the fairness of both the plea bargaining process and federal criminal trials generally. *Ready*, 82 F.3d at 555. To the extent that other courts have held otherwise, I respectfully disagree. *See Krilich*, 159 F.3d at 1024–26; *Burch*, 156 F.3d at 1320–322.

## CONCLUSION

For the foregoing reasons, defendant Duffy's motion to strike paragraph 2(C) from his proffer agreement with the government is granted.

SO ORDERED.