UNITED STATES of America

v.

Jaime GOMEZ and Thomas Marmolejas, Defendants.

No. S3 99 CR. 1048(DC).

United States District Court,
S.D. New York.

July 18, 2002.

As Amended July 24, 2002.

James B. Comey, United States Attorney for the Southern District of New York by Richard Sullivan, Marc L. Mukasey, Assistant United States Attorneys, New York City, for U.S.

Lynne F. Stewart, Sabrina P. Shroff, New York City, for Jaime Gomez.

Amsterdam & Branden, by Valerie S. Amsterdam, New York City, for Thomas Marmolejas.

## OPINION

CHIN, District Judge.

On February 2, 2002, after a three-week trial, a jury in this case convicted defen-

dants Jaime Gomez and Thomas Marmolejas on eight counts of murder, conspiracy, and drug-related offenses. The jury found that on May 26, 1998, Marmolejas drove Gomez and others to an apartment building in the Bronx, where Gomez shot and killed Johan ("El Profesor") Pena–Perez and wounded Nilton ("Barbita") Duran on behalf of the Reyes Heroin Organization.

The evidence of guilt was overwhelming. Gomez was arrested on the scene, after police officers confronted him in the apartment building, saw him drop a weapon, and chased him up the stairs. One of the victims, who was lying wounded on a landing, pointed him out to the police. In a proffer session before trial, Gomez admitted his involvement. A cooperating witness, who was in the van and fled with Marmolejas, implicated both defendants. Marmolejas was arrested just a few days after the shooting—driving the same van used in the shooting, re-stocked with new weapons.

Both defendants challenge their convictions. Gomez moves for a new trial, asserting that his Sixth Amendment rights were violated because the Court ruled that his counsel could not make arguments contradicting his proffer statements without opening the door to the admission of the statements. Gomez and Marmolejas both move to set aside the jury's verdict on Counts Four and Five of the Indictment, narcotics conspiracy counts, on the grounds that they were not participants in the narcotics conspiracy but instead were hired solely for a discrete transaction—to deal with Pena–Perez and Duran. They also argue that the Court erred in refusing to give a "single transaction" charge. For the reasons set forth below, the motions are denied. On the Court's own motion, however, Count Five is dismissed as to Marmolejas because the jury's guilty verdict on Count Five is inconsistent with the

jury's finding with respect to Count Four that the Government failed to prove that Marmolejas knew the conspiracy involved a kilogram or more of heroin.

## BACKGROUND

### A. *The Facts*

The facts are construed in the light most favorable to the Government. *See United States v. Morales,* 974 F.Supp. 315, 318 (S.D.N.Y.1997).

The Reyes Heroin Organization was run by Juan Matos ("Junior") Reyes from Santo Domingo. (Tr. at 335, 375). In New York, the organization was run by Pena–Perez and an individual known as El Potro. (*Id.* at 375). The conspiracy involved the distribution of large amounts of heroin. (*Id.* at 375).

In May 1998, Andres Peralta, a member of the conspiracy, hired Gomez, Marmolejas, and Johnny Martinez to kill Pena–Perez and Duran. (*Id.* at 383–85). Junior wanted the two killed because they had allegedly turned against the organization by robbing one of its own apartments, taking one or two kilos of heroin, between $30,000 and $100,000, and a beeper that the organization's customers used to contact it. (*Id.* at 377, 380, 382–83). On May 25, 1998, Peralta met with Robinson Reyes, Gomez, Marmolejas, and Martinez at 230th Street and Bailey Avenue in the Bronx. (*Id.* at 385, 389). That same day Gomez, Marmolejas, Martinez and Reyes made their first attempt to locate Pena–Perez and Duran. (*Id.* at 389, 392). They drove to a location in the Bronx and waited four or five hours for Pena–Perez and Duran to emerge, but they did not. (*Id.* at 399–401).

On May 26, 1998, the next day, the participants met at 230th Street and Bailey Avenue once again. (*Id.* at 402). Marmolejas drove the group to the same loca-

tion where they had waited the previous evening, and they waited for Pena–Perez and Duran again, for six hours or more. (*Id.* at 334, 404, 424, 428). Finally, Pena–Perez and Duran exited the building, got inside a Toyota Camry, and drove away. (*Id.* at 434, 435, 437). The men in the van followed, and when the Camry stopped on Walton Avenue at a red light, Gomez got out, carrying a machine gun. (*Id.* at 441–42). He fired 15 to 20 shots at the Camry. (*Id.* at 455). The Camry took off, the van followed, and the Camry then crashed into another car. (*Id.* at 456–57). Duran exited and ran. (*Id.* at 457–58). Gomez had returned to the van, but when he saw Duran run from the Camry, he took a pistol and ran after Duran. (*Id.* at 459).

Several plainclothes officers from the New York City Police Department were on patrol in the area, and they immediately went to Walton Avenue after hearing the gunshots. (*Id.* at 100–01). There, they saw Gomez run inside 1729 Walton Avenue carrying a gun and heard shots being fired inside the building. (*Id.* at 102, 155). The officers followed Gomez into the building. (*Id.* at 102). They momentarily retreated before re-entering the building, where they encountered Gomez coming down the stairs. (*Id.* at 102–03). When Gomez saw them, he dropped his weapon and fled up the stairs. (*Id.* at 103). The officers chased him. (*Id.* 104–05). While Gomez was running up the stairs, the officers found Duran bleeding on the third floor landing. (*Id.* at 105, 115). As the officers ran up the stairs, Duran yelled "that guy just shot me," and pointed up the stairs. (*Id.* at 158). The officers caught Gomez on the roof and arrested him. (*Id.* at 159). Pena–Perez was found dead in the car on Walton Avenue. (*Id.* at 108, 131, 160).

Marmolejas and Reyes drove off and discarded the weapons. (*Id.* at 693–94). Later that evening, Marmolejas collected $37,000 from members of the conspiracy for the killing of Pena–Perez. (*Id.* at 694–95). Marmolejas was arrested on June 4, 1998, inside the same van that he had driven to the murder scene. (*Id.* at 884, 909). The arresting officers found a secret compartment in the van containing a .38 caliber revolver, a 9–millimeter Smith & Wesson semi-automatic pistol, a .22 caliber semi-automatic pistol, a 9–millimeter semi-automatic pistol, numerous rounds of live ammunition, and a silencer. (*Id.* at 864–65, 871–73, 876).

### B. *Gomez's Proffer*

After this case was filed, Gomez's counsel repeatedly requested a meeting with the Government to discuss Gomez's possible cooperation. The Government asserts—and Gomez does not refute—that:

> During the pre-trial period of this case, counsel for Gomez besieged the Government with requests to arrange a meeting between Gomez and the Government with a view towards his entering into a cooperation agreement with the Government. On each occasion, the Government told Gomez's counsel that it was unlikely that Gomez would ever be signed up as a cooperating witness because of the horrific crimes he had committed.... However, when Gomez's counsel proffered to the Government that Gomez possessed valuable information about other unsolved crimes, the Government agreed to arrange a meeting.

(Gov.Mem. at 8–9). At the meeting, which took place on April 17, 2000, Gomez and his counsel executed the Government's standard written proffer agreement. The agreement provides, in pertinent part, that:

> (2) Should any prosecutions be brought against Client by this Office, the Government will not offer in evidence on its

case-in-chief, or in connection with any sentencing proceeding for the purpose of determining an appropriate sentence, any statements made by Client at the meeting, except in a prosecution for false statements, obstruction of justice or perjury with respect to any acts committed or statements made during or after the meeting or testimony given after the meeting.

(3) Notwithstanding item (2) above ... the Government may use statements made by Client at the meeting and all evidence obtained directly or indirectly therefrom for the purpose of cross-examination should Client testify, or *to rebut any evidence or arguments offered by or on behalf of Client* (including arguments made or issues raised sua sponte by the District Court) at any stage of the criminal prosecution (including bail, trial, and sentencing), should any prosecution of Client be undertaken.

(Gov.Mem. at 9) (emphasis added).

During the proffer session, with counsel present, Gomez admitted that:

[H]e and others, including Marmolej[a]s and Johnny Martinez, had been hired to murder Profesor and Barbita and that on the evening of May 26, 1998, acting with intent to kill, Gomez himself fired a 9–millimeter machine gun equipped with a silencer into the passenger side of the Toyota Camry in which Profesor and Barbita were seated.

(Gov't Letter dated Jan. 25, 2002 at 1–2).

## C. *Prior Proceedings*

### 1. *The Indictment*

The Indictment in this case contained eight counts. Count One charged the defendants with conspiracy to commit robbery and extortion in violation of 18 U.S.C. § 1951. Count Two charged conspiracy to commit murder-for-hire and Count Three charged substantive murder-for-hire, both

in violation of 18 U.S.C. § 1958. Count Four charged conspiracy to distribute and possess with intent to distribute one kilogram and more of heroin, in violation of 21 U.S.C. § 846. Count Five charged the defendants with murder while engaged in a major drug conspiracy, in violation of 21 U.S.C. § 848(e)(1)(A). Count Six charged both defendants with using and carrying firearms in relation to crimes of violence, in violation of 18 U.S.C. § 924(c). Count Seven charged murder in the course of a 924(c) violation, pursuant to 18 U.S.C. § 924(j), and Count Eight, filed against Marmolejas alone, charged possession of a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k).

### 2. *The Proffer Statements*

Before trial, the Government raised the issue of admitting both defendants' proffer statements if either defendant testified or argued in a manner inconsistent with those statements. (Gov't Letter dated Jan. 3, 2002 at 1). The Court observed initially that the statements would be "allowed in only if the defendants testify and the statements can be used as impeachment." (Tr. at 12).

After further discussion, the Court noted that if defense counsel "stand up and flatly say that the defendants did not have knowledge, that I would want to see a good-faith, factual basis for such a statement because I would be hard pressed to accept one in light of the admissions during the proffer statements. So that I think if that happens, I could reconsider. I guess we'll need to address it again right before closings after we see the evidence." (*Id.* at 15).

On January 23, 2002, on cross-examination, Gomez's counsel asked whether Reyes would "put [the] machine gun in Jaime Gomez's hands" to avoid prison.

(*Id.* at 581). In a letter brief dated January 25, 2002, the Government sought permission to introduce Gomez's proffer statements, arguing that the question posed on January 23 contradicted the statements made by Gomez at the proffer meeting because "it was intended to suggest that Robinson Reyes lied when he testified that Gomez carried the machine gun and that Gomez was telling the truth when he told the police that Johnny Martinez had the machine gun." (Gov't Letter dated Jan. 25, 2002 at 2).

The Court denied the Government's request, holding that the question "was more in the context of generally attacking Mr. Reyes' credibility" than "suggesting that Mr. Gomez wasn't there or that Mr. Gomez didn't intend to kill anyone." (Tr. at 836).

Before closing statements, the issue of the admissibility of the proffer statements was raised again. Gomez's counsel wanted to argue that the shooting was "an intended kidnapping gone wrong" in her closing statement. (*Id.* at 1452). The Government represented that Gomez had, in fact, said that Gomez said the shooting was "an intentional murder" at the proffer meeting. (*Id.* at 1453). The Court ruled that Gomez "is precluded from making factual assertions that are inconsistent with the proffer statement" without opening the door to the statement's admission. (*Id.* at 1451).

### 3. The "Single Transaction" Rule

After the evidence closed, defense counsel moved for a judgment of acquittal on the basis that the shooting "was an independent transaction. There is no indication here that these two individuals joined up and had a relationship with that ongoing conspiracy that existed for quite some time." (*Id.* at 1342–47). I denied the motion. (*Id.* at 1353).

First, I noted that "even though a defendant is not involved in the actual distribution [of narcotics], if he is a hitman and he is hired to hit someone to further the goals and operation of the conspiracy, ... he can be found to be a co-conspirator." (*Id.* at 1343). Second, I concluded that both defendants could be convicted of narcotics conspiracy if the jury were to find that they participated in the transaction with knowledge of the conspiracy's unlawful purpose and with the intent to further the conspiracy's business. (*Id.* at 1344–45). Third, I held that the record contained sufficient evidence to support such a verdict—the evidence showed that the organization had been robbed of heroin, money, and a beeper, the organization hired hitmen to get the beeper back and to punish those who stole the beeper, the organization was willing to spend $37,000 to do so, and the beeper was obviously important to the organization's drug activities. (*Id.* at 1350–1353).

In the alternative, defendants requested a single transaction charge. (*Id.* at 1146). The requested charge would have instructed the jury that evidence of a single offense committed by an outsider to the narcotics conspiracy and a member of the conspiracy "ordinarily does not prove 'an independent agreement on the part of the outsider to join the ranks of the conspiracy.'" (Def.Mem. at 7, n. 1). I denied the request. (Tr. at 1355).

### 4. The Verdict

The jury convicted both defendants on all counts. With respect to Count Four, narcotics conspiracy, the jury was asked a special interrogatory on drug quantity to ensure that, if the defendants were found guilty, the sentencing would comport with the rule of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The jury was charged that "[t]he

quantity of heroin is not an element of the offense charged in Count Four of the Indictment, and you do not need to determine the precise quantity of heroin involved in Count Four. Rather, you need only decide whether one kilogram or more of a mixture or substance containing heroin was involved and, if not, whether 100 grams or more was involved." (Tr. at 1595). The verdict sheet for Count Four asked the jury, separately as to Gomez and Marmolejas:

> [D]id the conspiracy involve one kilogram or more of a mixture or substance containing a detectable amount of heroin? ... [and]

> [D]id the Government prove that [Gomez and Marmolejas] reasonably could have foreseen that the conspiracy involved that amount of heroin? [1]

The jury found that the conspiracy involved one kilogram or more of a mixture or substance containing a detectable amount of heroin. As to the second question, however, the jury answered "yes" as to Gomez but "no" as to Marmolejas.

Notwithstanding this verdict, the jury convicted both Gomez and Marmolejas on Count Five, which charged them with murder while engaged in a *major* drug conspiracy, *i.e.*, one involving one kilogram or more of heroin.

These motions followed.

## DISCUSSION

Defendants' motions raise three areas for discussion. First, Gomez argues that by ruling that the prosecution could use his proffer statement to rebut inconsistent arguments made by counsel on his behalf, the Court "muzzled Mr. Gomez's counsel, effectively rendering his defense at trial little more than a sham." (Def.Mem. at 1). Gomez relies on what he calls the "bright-line rule" of *United States v. Duffy*, 133 F.Supp.2d 213 (E.D.N.Y.2001), to argue that proffer statements may be used only to impeach a defendant who testifies contrary to his proffer, and in no other circumstance. Second, Gomez and Marmolejas argue that the Court erred in refusing to include a "single transaction" instruction because there was "[n]o other connection between the Reyes brothers' drug operation and [the defendants]" besides the shooting. (Def.Mem. at 7). Therefore, defendants argue that the narcotics conspiracy convictions under Counts Four and Five must be reversed. Third, because the jury found with respect to Count Four that Marmolejas could not have foreseen that the conspiracy involved more than a kilogram of heroin, the Court must consider whether Marmolejas's conviction under Count Five for murder in furtherance of a major narcotics conspiracy, *i.e.*, one involving a kilogram or more of heroin, can be sustained. I address each of these areas, after first discussing the standards applicable to post-trial motions in criminal cases.

### A. *Fed.R.Crim.P. 33 & 29*

Pursuant to Fed.R.Crim.P. 33, a court may grant a defendant's motion for a new trial only "if the interests of justice so require." A new trial is to be granted only "in the most extraordinary circumstances." *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir.1993) (citation omitted). The defendant bears the burden of proving that this extraordinary remedy should be granted, *see United States v. Sasso*, 59 F.3d 341, 350 (2d Cir.1995), and the decision to order a new trial rests within the

---

1. If the jury had not found that the conspiracy involved one kilogram or more of a mixture or substance containing a detectable amount of heroin, the verdict sheet asked whether the conspiracy involved 100 grams or more of such a mixture or substance.

discretion of the trial judge. *See United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir.1992).

■■■ Rule 29 provides that "the court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense." Fed.R.Crim.P. 29(a). "A conviction must be upheld if, after viewing the evidence in the light most favorable to the Government, and drawing all reasonable inferences in its favor, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Medina,* 944 F.2d 60, 66 (2d Cir.1991) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Therefore, "a jury's verdict will be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it.'" *United States v. Nersesian,* 824 F.2d 1294, 1324 (2d Cir.1987).

### B. *The Proffer Statements*

Gomez moves for a new trial on the grounds that the Court erred in holding that the Government could use his proffer statements against him if his counsel made arguments inconsistent with the statements. In particular, counsel wanted to argue that the shooting was "an intended kidnapping gone wrong," but I ruled that counsel could not do so without opening the door to the admission of Gomez's statement at his proffer session that the shoot-

ing was "an intentional murder." (Tr. at 1452–53).

The proffer agreement clearly and unambiguously provided that the Government could use the proffer statements to rebut inconsistent arguments made by counsel:

[T]he Government may use statements made by [Gomez] at the [proffer] meeting ... for the purpose of cross-examination should [Gomez] testify, or *to rebut any evidence or arguments offered by or on behalf of [Gomez].*

Hence, to prevail on this point, Gomez must show that the proffer agreement is unconscionable or otherwise unenforceable.

In general, statements made by a defendant in the course of unsuccessful plea discussions with the Government are inadmissible. Fed.R.Crim.P. 11(e)(6); Fed.R.Evid. 410. These rules are subject to two express exceptions, which do not apply here.[2] The Government's standard proffer agreement creates a third exception, as the defendant agrees that his proffer statements can be used against him in certain circumstances.

The question thus arises as to whether Rules 11(e)(6) and 410 may be waived. In *United States v. Mezzanatto,* 513 U.S. 196, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995), the Supreme Court answered the question in the affirmative, holding that the Government could use a defendant's plea statements to impeach him where he testified at trial in a manner inconsistent with his plea statements and he had agreed during the plea discussions to such usage. The Court held that "absent some affirmative indication that the agreement was entered into

---

**2.** Statements made in the course of plea discussions are admissible in a proceeding "wherein another statement made in the course of the same plea or plea discussions has been introduced and the statement ought in fairness to be considered contemporaneously with it. Such statements are also admissible in a proceeding for perjury or making false statements." Fed.R.Crim.P. 11(e)(6)(D).

unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement Rules is valid and enforceable." 513. U.S. at 210, 115 S.Ct. 797.

*Mezzanatto* was a 7–2 decision. In a concurring decision, three justices sought to limit the decision as they cautioned that "[i]t may be ... that a waiver to use such statements in the case in chief would more severely undermine a defendant's incentive to negotiate, and thereby inhibit plea bargaining. As the Government has not sought such a waiver, we do not here explore this question." 513 U.S. at 211, 115 S.Ct. 797. (Ginsburg, J., concurring, with O'Connor and Breyer, JJ., joining).

*Mezzanatto* thus did not address the precise issue of whether a defendant may waive his rights under Rules 11(e)(6) and 410 with respect to the Government's use of plea statements in its case in chief or to rebut contradictory evidence or arguments where the defendant does not testify. The Second Circuit has not addressed the issue in these specific contexts, but other courts have, with varying results. *See generally* Richard B. Zabel & James J. Benjamin, Jr., *Are "Queens for a Day" Pacts Courtesans?*, N.Y.L.J., p. 1, col. 1 (June 13, 2001).

After *Mezzanatto*, the Seventh Circuit applied the Court's reasoning to uphold the admissibility of proffer statements where the defendant did not testify. In *United States v. Krilich*, 159 F.3d 1020 (7th Cir.1998), the court upheld the introduction of a proffer statement to impeach not only the defendant's witnesses, but also to rebut arguments suggested by defense counsel in his cross-examination of the Government's witnesses. *Id.* Similarly, in *United States v. Burch*, 156 F.3d 1315 (D.C.Cir.1998), the D.C. Circuit held that the defendant's waiver of his rights under Fed.R.Crim.P. 11(e)(6) and Fed. R.Evid. 410 in a plea agreement was valid,

even though he later withdrew the plea. The *Burch* court held that statements made during the plea allocution before the court and during a subsequent de-briefing with Government agents were admissible not only for rebuttal or impeachment purposes, but also during the Government's case in chief. *Id.* at 1321–23. *See also United States v. Young*, 223 F.3d 905 (8th Cir.2000) (holding, on interlocutory appeal from district court's ruling on a motion *in limine*, that affidavit executed by defendant during plea negotiations in which he admitted elements of crimes charged could be introduced by Government against him at trial because defendant had waived his rights under plea-statement rules).

Although the Second Circuit has not addressed the specific issue of whether proffer statements can be used to rebut evidence presented or arguments made on behalf of a non-testifying defendant, district courts within the Second Circuit have. In *Duffy*, 133 F.Supp.2d 213, the Eastern District invalidated a portion of a proffer agreement that allowed the Government to use any statements made by the defendant "as substantive evidence to rebut any evidence offered or elicited, or factual assertions made, by or on behalf of [the defendant] at any stage of a criminal prosecution (including but not limited to detention hearing, trial or sentencing)." *Id.* at 214 (quoting paragraph 2(C) of the proffer agreement). The court held that this section of the proffer agreement violated defendant's Sixth Amendment rights to a defense and to effective assistance of counsel.

The court offered two rationales for its holding. First, the court wrote that while the waiver at issue in *Mezzanatto* was "merely the waiver of an evidentiary rule," the agreement at issue in *Duffy* prevented Duffy's attorney from making "any sort of *meaningful* defense" because "any affir-

mative theory of factual innocence ... would permit the government to offer Duffy's proffer." 133 F.Supp.2d at 216 (emphasis in original). The court noted the practical difficulties for a defense lawyer attempting to question witnesses under such agreements, observing that:

> Even within the narrowly-prescribed areas that the government concedes are fair game, there are nuances and line drawing problems. For me to preview each of defense counsel's questions in advance would be impractical, and, yet, there is no other way for him truly to be certain of the consequences that a particular line of examination will have. I do not see how Duffy's attorney can effectively represent him under these conditions.

*Id.*

The *Duffy* court's second focus was contract law. The court emphasized that the Second Circuit scrutinizes contractual waivers "even in the context of plea agreements, which include the safeguard of judicially supervised allocutions." *Id.* at 217. The court also discussed the disparity in bargaining power between the Government and criminal defendants, and opined that the agreement necessarily exploited this imbalance because:

> After signing the standard proffer agreement, the terms of which are dictated by the government, the only thing that a defendant is guaranteed is the chance to convince the prosecutor to enter a deal. At the same time, the defendant bears all of the risk. The government is under no obligation to accept the defendant's offer to cooperate, and it loses nothing by declining.

*Id.* at 217–18 (footnote omitted).[3]

### 3. *Application*

■ To the extent that *Duffy* holds that a defendant's agreement that his proffer statements may be used by the Government against him to rebut any evidence or arguments offered on his behalf, even where he does not testify, is unenforceable as a matter of law, I respectfully disagree. To the contrary, I hold that where a proffer agreement is entered knowingly and voluntarily and its terms are clear and unambiguous,[4] it is enforceable, at least to the extent that the Government may use the defendant's proffer statements to rebut evidence or arguments offered on his behalf at trial, even where he does not

---

**3.** *See also United States v. Chaparro,* 181 F.Supp.2d 323 (S.D.N.Y.2002) (denying defendant's motion to preclude Government from using proffer statements during sentencing proceedings, where proffer statements contradicted positions taken by defendant on downward departure motion); *United States v. Lauersen,* No. 98 Cr. 1134(WHP), 2000 WL 1693538, at *6, 8 (S.D.N.Y. Nov. 13, 2000) (holding that defendant's proffer agreement was invalid to extent Government wished to use statements for purposes other than impeachment, but holding that because court was bound to protect integrity of proceedings and to ensure that matters presented to jury are grounded in "good faith," it would not permit defendant's counsel "to elicit substantive (non-impeachment) testimony, either on cross-examination of witnesses called by the Government or from witnesses called to testi-

fy on her behalf, or to present arguments to the jury at any stage of the proceeding, including opening statements, that directly contradict specific factual statements by [defendant] in the [proffer] statement"); *United States v. Fronk,* 173 F.R.D. 59 (W.D.N.Y.1997) (court suppressed statements made to law enforcement because there was no valid waiver, holding that Government had not proven that defendant knowingly and voluntarily waived his right to exclusion of plea negotiation statements).

**4.** Any ambiguities in a proffer agreement must be resolved against the Government, *see Chaparro,* 181 F.Supp.2d at 330, but there were no ambiguities in the proffer agreement in this case.

testify.[5] I reach this conclusion for the following reasons:

■ First, as long as a defendant enters into a proffer agreement knowingly and voluntarily and the terms of the proffer agreement are clear and unambiguous, fairness dictates that the agreement be enforced. A proffer agreement is a contract that should be enforced in accordance with principles of contract law. *See United States v. Gregory,* 245 F.3d 160, 165 (2d Cir.2001) (cooperation agreement); *United States v. Liranzo,* 944 F.2d 73, 77 (2d Cir.1991) (proffer agreement). Although special consideration must be given to a defendant's due process rights, the parties should be held to the terms of their agreement. The defendant receives what may turn out to be a significant benefit; although the Government is under no obligation to do so, *see United States v. Cruz,* 156 F.3d 366, 370 (S.D.N.Y. 1998), it agrees to give the defendant an opportunity to be heard, an opportunity to convince the Government to enter into a cooperation agreement with him. If the defendant is successful, he may receive a substantial downward departure in sentencing as well as a sentence below an otherwise applicable mandatory minimum. He also will have an opportunity to show the Government and the Court that he is genuinely remorseful about his misdeeds. *See United States v. Chaparro,* 181 F.Supp.2d at 333–35. In return for the opportunity to seek these benefits, however, the defendant agrees to be truthful. Fairness requires that he be held to that agreement. If the proffer agreement is not enforced, a defendant will have less incentive to be truthful, for he will know that his proffer statements cannot be used against him at trial as long as he does not testify, even if he presents inconsistent evidence or arguments. *See id.* at 335 ("Enforcing proffer agreements will also enhance the integrity of the judicial truth-seeking function."); *see also Krilich,* 159 F.3d at 1025 (A conditional waiver "tends to keep the defendant honest, which makes the proffer device more useful to the both sides. For this strategy to work the conditional waiver must be enforceable; its effect depends on making deceit costly.").

Second, plea bargaining and cooperation should be encouraged. Prosecutors will be reluctant to enter into cooperation agreements if they cannot obtain some assurance that the defendant will tell the truth, and if a defendant knows that his statements cannot later be used against him (unless he testifies), he may be more likely to embellish and lie during the proffer sessions. As the Supreme Court has held:

> Prosecutors may be especially reluctant to negotiate without a waiver agreement during the early stages of a criminal investigation, when prosecutors are searching for leads and suspects may be willing to offer information in exchange for some form of immunity or leniency in sentencing.... If prosecutors were precluded from securing such agreements, they might well decline to enter into cooperation discussions in the first place and might never take this potential first step toward a plea bargain.

*Mezzanatto,* 513 U.S. at 207–08, 115 S.Ct. 797.

Third, although the Government does have significant bargaining power in these situations, it is because the Government has substantial evidence to prove the defendant's guilt. By coming forward to

---

5. In the absence of inconsistent arguments or evidence presented by defendant (through testimony or via the efforts of counsel), the Government is prevented by the proffer agreement from offering the proffer statement during its case-in-chief.

make a proffer, a defendant is admitting his guilt and offering to implicate others by using knowledge gained from his personal involvement in criminal conduct. Ironically, of course, the greater a defendant's guilt, the more he may have to offer by way of cooperation. But it is the defendant's guilt and the availability of evidence to prove his guilt that creates the disparity in bargaining power. This disparity is no basis for holding the agreement unenforceable. Moreover, a defendant does have options. He can plead guilty without a cooperation agreement. He can go to trial. He can attempt to make a proffer through his lawyer. He can simply tell the truth, both during the proffer sessions and, should they fail, at trial. What he does not have the right to do, however, is lie. *See Nix v. Whiteside,* 475 U.S. 157, 173, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986).

Fourth, defense counsel are able to put on a meaningful defense without opening the door to the admission of proffer statements. As in this case, defense counsel are certainly able to challenge the credibility of the Government's witnesses and the weight and sufficiency of the Government's evidence. *See Krilich,* 159 F.3d at 1025 ("Impeachment of a witness need not be 'contrary to' or 'inconsistent with' a defendant's admission of guilt in a bargaining proffer."). Indeed, in this case, I rejected the Government's argument that defense counsel's suggestion that Reyes would "put [the] machine gun in Jaime Gomez's hands" to avoid prison (Tr. at 581) opened the door to admitting the proffer statements. Moreover, the Government has not suggested that a claim that a defendant is factually innocent, by itself, would open the door to admission of the proffer statements.

Finally, in the end enforcement of a proffer agreement does not preclude defense counsel from taking a position or presenting evidence inconsistent with a defendant's proffer statements. She may do so. But if she does, however, it is only fair that the Government then be permitted to present the defendant's own words in rebuttal. In addition, it is difficult to conceive of a good faith basis for an argument by counsel that contradicts her client's own statements made when the client had great incentive to tell the truth.

■ Here, the proffer agreement was clear and unambiguous, and Gomez was represented by experienced counsel when he signed the proffer agreement. Indeed, Gomez has not argued that his waiver was anything but knowing and voluntary. *See United States v. Ready,* 82 F.3d 551, 556 (2d Cir.1996). His attorneys were not precluded from arguing that he was innocent or not guilty. They were not precluded from attacking the credibility of the Government's witnesses or challenging the weight and sufficiency of the Government's witnesses. They were merely put on notice that if they presented arguments or evidence that specifically contradicted Gomez's proffer statements, the Government would be permitted to present Gomez's own words in rebuttal—as he agreed. His attorneys presented a capable, spirited, and zealous defense that vigorously challenged the Government and its evidence. In the end, their effort failed, but it failed because of the overwhelming nature of the Government's proof, and not because of my ruling with respect to the conditional admissibility of the proffer statements.

Accordingly, this prong of the motion is denied.

## C. *The Single Transaction Rule*

### 1. *The Rule*

■ The single transaction rule provides that "if a crime necessarily involves the mutual cooperation of two persons, and

if they have in fact committed the crime, they may not be convicted of a conspiracy to commit it." *United States v. Zabare*, 871 F.2d 282, 287 (2d Cir.1989) (quoting *United States v. Zeuli*, 137 F.2d 845 (2d Cir.1943)). Defendants' reliance on the rule is misplaced. As the Second Circuit recognized in *Zabare*, it is well-settled that "a defendant's participation in a single transaction can suffice to sustain a charge of knowing participation in an existing conspiracy." *Zabare*, 871 F.2d at 287 (citations omitted). Moreover, to prove a defendant's membership in a conspiracy the Government need not prove that the defendant knew about all of the actions of all of the conspiracy's members. *See United States v. Miranda–Ortiz*, 926 F.2d 172, 175–76 (2d Cir.1991).

To determine whether the involvement of a defendant in a single transaction will support a conspiracy conviction, a court must determine whether "the qualitative nature of the act viewed in the context of the entire conspiracy in a particular case supports beyond a reasonable doubt the inference 'that an individual is involved in a conspiracy.'" *Zabare*, 871 F.2d at 287 (quoting *United States v. Murray*, 618 F.2d 892, 903 (2d Cir.1980)) (internal quotations omitted); *see also United States v. Torres*, 503 F.2d 1120, 1124 (2d Cir. 1974). Of course, in some circumstances, proof of participation in a single isolated narcotics transaction is insufficient to warrant a conviction for conspiracy. *See United States v. Agueci*, 310 F.2d 817, 835–36 (2d Cir. 1962); *United States v. Aviles*, 274 F.2d 179, 190 (2d Cir.1960). In *Aviles*, for example, the defendant made one purchase of narcotics from a member of the conspiracy, and he had no knowledge regarding the seller's membership in the conspiracy. *Aviles*, 274 F.2d at 188. Accordingly, the court reversed his conviction for conspiracy.

The Second Circuit has emphasized, however, that the single transaction rule "is not an arbitrary rule which is to be applied rigidly and without reason. It has been utilized to exonerate a defendant only when there is no independent evidence tending to prove that the defendant had some knowledge of the broader conspiracy and when the single transaction is not in itself one from which such knowledge might be inferred." *Agueci*, 310 F.2d at 836. In *United States v. McCullah*, 76 F.3d 1087, 1103 (10th Cir.1996), the Tenth Circuit upheld a defendant's conviction under 21 U.S.C. § 848(e)(1)(A) even though his participation in a narcotics conspiracy was limited to acting as a "hired henchm[a]n." The court wrote:

> The evidence presented at trial indicated that Mr. McCullah knew that the planned murder was being carried out on behalf of the Arvizu drug organization and knew that the murder was being committed to further the organization's criminal objectives. This knowledge suffices to make Mr. McCullah's actions "working in furtherance of" the Arvizu continuing criminal enterprise. The fact that Mr. McCullah was not engaged in the drug trafficking portion of the Arvizu criminal enterprise is irrelevant.

*Id.* at 1102–03.

### 2. Application

In this case, two issues are presented that involve the "single transaction rule." First, defendants argue that the record contained insufficient evidence to support a narcotics conspiracy conviction because their role was limited: they were not involved in the distribution of drugs and they were hired solely to take care of Pena–Perez and Duran. Second, they argue that the Court erred in refusing to give the jury a "single transaction charge,"

which would have instructed the jury that evidence of a single offense committed by an outsider to a narcotics conspiracy and a member of the conspiracy "ordinarily does not prove an independent agreement on the part of the outsider to join the conspiracy." (Def.Mem. at 7, n. 1). Both arguments are rejected.

 First, the record contained substantial evidence to support the jury's conclusion that Gomez and Marmolejas were acting in concert with the others to further the goals of the conspiracy. Gomez and Marmolejas were hired as hitmen in early May and met with the others on May 25th and 26th. The evidence showed that they knew the Reyes brothers were distributing narcotics and that they knew they were being hired to assist in that effort. Marmolejas testified that he thought that his job on May 25 was "about a beeper, get this guy to listen, to give me the beeper." (Tr. at 1230). Although Marmolejas said that he did not think the person with the beeper had "anything to do with drugs," he later admitted that "it went through my mind, maybe this guy, he sells drugs and didn't give him the beeper back or he needs the beeper." (Tr. at 1230, 1279). Of course the jury was entitled to find, in light of all the evidence, that the beeper was an important asset for this heroin organization, and that Marmolejas (and Gomez) knew this. As Reyes testified, beepers are central to the heroin business. (Tr. at 383). Drug dealers and customers use them to maintain contact and communicate locations and amounts of drugs. (Tr. at 353–54, 383). Indeed, courts in this circuit have found that the possession of a beeper supports a finding by a jury of guilt of conspiracy. *See United States v. Zapata–Tamallo,* 833 F.2d 25, 28 (2d Cir.1987); *United States v. Cuervelo,* 726 F.Supp. 103, 107 (S.D.N.Y.1989).

Marmolejas and Gomez sat for hours on two days in a van with members of the heroin organization—knowing that they had been hired to "get this guy to listen, to give [them] a beeper." They had been promised a substantial amount of money to accomplish this task. The jury could surely conclude that they knew they had been hired to further the objectives of a narcotics conspiracy. The jury could also surely conclude that Gomez and Marmolejas played an important role in the conspiracy—they were enforcers hired to protect the organization and to punish those who would seek to undermine it.

 Second, the requested instruction was not warranted by the facts and it would have confused the jury. Instead, I instructed the jury as follows:

> A defendant may be guilty of conspiracy even if he was involved in only one transaction with the conspiracy, but he is guilty only if he participated in the transaction with knowledge of the conspiracy's unlawful purpose and with the intent of furthering the conspiracy's business or objective. In other words, you cannot find the defendants guilty unless you find, beyond a reasonable doubt, that the defendants knew the Reyes brothers and the others were in the business of distributing illegal narcotics and that the defendants acted with the intent to further the business or objectives of the Reyes brothers's organization.

(Tr. at 1592). Hence, the jury was specifically instructed that it could not find the defendants guilty of narcotics conspiracy unless the Government proved that the defendants knew the Reyes brothers were in the narcotics business and that the defendants acted with the intent to further that business or its goals. This instruction was sufficient. The jury found both ele-

ments as to both defendants. Hence, the guilty verdict on Count Four must stand.

### D. *Counts Four and Five*

To find the defendants guilty under Count Four, narcotics conspiracy, the jury was required to find that the narcotics conspiracy existed and that the defendants knowingly associated themselves with the conspiracy. The Government was not required to prove that the defendants knew the exact nature or quantity of the drugs involved in the conspiracy.

To ensure that the defendants' sentences would comply with *Apprendi* if they were convicted, however, the verdict sheet asked the jury to indicate for Count Four whether the conspiracy involved one kilogram or more of a mixture or substance containing a detectable amount of heroin. The verdict sheet also asked whether the Government had proven that each defendant reasonably could have foreseen that the conspiracy involved that amount of heroin. While the jury found that the conspiracy involved one kilogram or more of a mixture or substance containing a detectable amount of heroin, it found that Marmolejas could not have foreseen that the conspiracy involved that amount of heroin.

Nonetheless, the jury then found Marmolejas guilty on Count Five, which charged intentional murder while engaged in a major drug conspiracy. To find Marmolejas guilty of Count Five, however, the jury was required to find that he was engaged in a "major" drug conspiracy— namely, that the conspiracy involved at least one kilogram of heroin. *See* 21 U.S.C. §§ 841(b)(1)(A), 848(e)(1)(A). Because the jury found that Marmolejas could not have reasonably foreseen that the conspiracy involved one kilogram or more of a mixture or substance containing a detectable amount of heroin, the jury's

finding of guilt on Count Five is inconsistent with its verdict on Count Four. Accordingly, the jury's verdict on Count Five is set aside as to Marmolejas and he is acquitted on that count.

### *CONCLUSION*

For the forgoing reasons, defendants' motions are denied in all respects. On the Court's own motion, however, the jury's verdict as to Count Five against Marmolejas is vacated and Count Five is dismissed as to him.

SO ORDERED.